**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 11-3357
_____

MICHEL SYLVAIN

v.

ATTORNEY GENERAL OF THE UNITED STATES;
BRIAN ELWOOD, Warden of Monmouth County Jail;
CHRISTOPHER SHANAHAN, Field Office Director;
JOHN MORTON, Director, Bureau of Immigration and
Customs Enforcement;
and SECRETARY, U.S. DEPARTMENT OF
HOMELAND SECURITY


Attorney General of the United States;
Christopher Shanahan, Field Office Director;
John Morton, Director, Bureau of Immigration and
Customs Enforcement; Secretary U.S. Department
of Homeland Security,
                                    Appellants
_____


On Appeal from the United States District Court

for the District of New Jersey
(District Court No. 3-11-cv-03006)
District Judge: The Honorable Joel A. Pisano
_____

Argued March 19, 2013

Before: SMITH, GREENAWAY, JR., and
VAN ANTWERPEN, *Circuit Judges*

(Filed:  April 22, 2013)

Andrew F. Erba, II   [ARGUED]
Williams, Cuker & Berezofsky
1515 Market Street
Suite 1300
Philadelphia, PA 19102
        *Counsel for Appellee*

Neelam Ihsanullah   [ARGUED]
United States Department of Justice
Office of Immigration Litigation
P.O. Box 868
Ben Franklin Station
Washington, DC 20001

Alex Kriegsman
Office of United States Attorney
970 Broad Street
Room 700
Newark, NJ 07102

Flor M. Suarez
United States Department of Justice
Office of Immigration Litigation
Suite 6102
450 5th Street, N.W.
Washington, DC 20001
        *Counsel for Appellants*

Andres C. Benach
Benach Ragland LLP
1333 H Street, N.W.
Suite 900 West
Washington, DC 20005

Alina Das   [ARGUED]
Washington Square Legal Services, Inc.
Immigrant Rights Clinic
245 Sullivan Street
5th Floor
New York, NY 10012

*Counsel for Amici-Appellees*

––––––––––––––––––

OPINION

––––––––––––––––––

SMITH, *Circuit Judge.*

Statutory language is important. It takes on added significance when a person's freedom is at stake. Under the Immigration and Nationality Act, immigration officials "shall take into custody any" deportable alien who has committed various crimes "when the alien is released" from detention for those crimes. 8 U.S.C. § 1226(c)(1). The Act requires officials to hold such aliens without any possibility of release while awaiting their removal proceedings. *Id.* § 1226(c)(2). The scheme is known as mandatory detention.

This case presents a straightforward question: Do immigration officials lose authority to impose mandatory detention if they fail to do so "when the alien is released"? The answer turns on the interplay between several provisions of the Act. We conclude that dilatory officials do not lose authority, and so we will reverse the District Court's decision to the contrary.

4

# I

Michel Sylvain is a citizen of Haiti. He entered the United States as a legal permanent resident in 1988. Since then, Sylvain has had multiple run-ins with the law. In total, he has been convicted of over ten drug-related crimes—indeed, he once served a three-year prison sentence for making and selling cocaine, and he spent a week in jail for possessing drugs as recently as 2003. He also has been convicted for unlawfully possessing a weapon and for criminal mischief. Suffice it to say, Sylvain has not been a model noncitizen while living in the United States.

Most recently, Sylvain was arrested in 2007 for possessing drugs. He pled guilty and received a conditional discharge. Under New York law, a conditional discharge does not require "imprisonment or probation." N.Y. Penal Law § 65.05(2). A person who receives a conditional discharge generally must perform community service—although no direct supervision is necessary. *See id.* (noting that defendants subject to a conditional discharge must meet "such conditions as the court may determine"). This means that Sylvain did not see the inside of a jail cell for nearly a decade.

Sylvain's luck ran out two years ago. Officials from Immigration and Customs Enforcement arrested

him on April 12, 2011. They concluded that he was deportable under the Immigration and Nationality Act because he had committed various deportable offenses—in particular, he was an aggravated felon with a history of drug crimes. *See* 8 U.S.C. § 1227(a)(2)(A)(iii), (a)(2)(B)(i). The officials further concluded that he was subject to mandatory detention under 8 U.S.C. § 1226(c) and held him without a bond hearing. They reached this conclusion even though Sylvain was last in custody on drug charges in 2007, nearly four years before his arrest in 2011.[1]

One month after his arrest, Sylvain petitioned for a writ of habeas corpus in the District Court for the District of New Jersey. Sylvain did not challenge his removability. Rather, he argued that mandatory detention did not apply to him. In his view, the phrase "when . . . released" in § 1226(c)(1) means that immigration officials must detain aliens at the moment of their release from prior custody. If the officials delay—as they did in his case—mandatory detention does not apply. He thus argued that he was eligible for a bond hearing. The District Court

---

[1] As we explain in Part IV.B, a person who is arrested is in custody for purposes of the "when . . . released" clause of § 1226(c)(1). This means that Sylvain was in custody when he was arrested in 2007.

6

agreed and granted his petition on June 28, 2011. Sylvain received a hearing, paid bond, and is no longer in custody. The parties tell us that his next removal hearing is on July 24, 2014.

The government appealed. It argues that mandatory detention does not require *immediate* detention. As a result, the officials retained authority to impose mandatory detention despite their four-year delay. For his part, Sylvain continues to argue that officials must act immediately. He also argues for the first time on appeal that the conditional discharge following his 2007 conviction was not a "release[]" within the meaning of the statute. 8 U.S.C. § 1226(c)(1) ("The Attorney General shall take into custody any alien [who has committed various crimes] when the alien is *released*." (emphasis added)).

II

Congress created mandatory detention less than twenty years ago. Under the original text of the Immigration and Naturalization Act, all deportable aliens were eligible for a bond hearing. *See Patel v. Zemski*, 275 F.3d 299, 304 (3d Cir. 2001), *abrogated by Demore v. Kim*, 538 U.S. 510 (2003). As time passed and crime rates soared, Congress began making it more difficult for aliens to receive a bond hearing. *Id.* This culminated in the Illegal Immigration Reform and Immigrant Respon-

sibility Act of 1996 § 303, 8 U.S.C. § 1226.[2] The Act establishes a general rule that allows bond hearings for most aliens and an exception for some criminals—the former in subsection (a), the latter in subsection (c):

> (a) Arrest, detention, and release
>
> On a warrant issued by the Attorney General, an alien may be arrested and detained pending a decision on whether the alien is to be removed from the United States. Except as provided in subsection (c) of this section and pending such decision, the Attorney General—
>
>> (1) may continue to detain the arrested alien; and
>>
>> (2) may release the alien on—
>>
>>> (A) bond of at least $1,500 with security approved by, and containing con-

---

[2] Section 303 of the Illegal Immigration Reform and Immigrant Responsibility Act amended § 236 of the original Immigration and Nationality Act and is codified at 8 U.S.C. § 1226.

ditions prescribed by, the Attorney General; or

(B) conditional parole

. . . .

(c) Detention of criminal aliens

(1) Custody

The Attorney General shall take into custody any alien who—

(A) is inadmissible by reason of having committed any offense covered in section 1182(a)(2) of this title,

(B) is deportable by reason of having committed any offense covered in section 1227(a)(2)(A)(ii), (A)(iii), (B), (C), or (D) of this title,

(C) is deportable under section 1227(a)(2)(A)(i) of this title on the basis of an offense for which the alien has been sentence [sic] to a term of imprisonment of at least 1 year, or

9

(D) is inadmissible under section 1182(a)(3)(B) of this title or deportable under section 1227(a)(4)(B) of this title,

when the alien is released, without regard to whether the alien is released on parole, supervised release, or probation, and without regard to whether the alien may be arrested or imprisoned again for the same offense.

(2) Release

The Attorney General may release an alien described in paragraph (1) only if [a narrow witness-protection exception applies], and the alien satisfies the Attorney General that the alien will not pose a danger to the safety of other persons or of property and is likely to appear for any scheduled proceeding. . . .

8 U.S.C. § 1226(a), (c).

Subsection (a) applies to most deportable aliens. It allows immigration officials to detain an alien "pending a decision on whether the alien is to be removed from the United States." *Id.* § 1226(a) ("On a warrant issued by

10

the Attorney General, an alien may be arrested and detained . . . ."). Such aliens are eligible for a bond hearing. *Id.* And they are free to leave detention if an officer decides that they do not pose a danger to society and likely will attend a future removal proceeding. *See* 8 C.F.R. § 236.1(c)(8). But they are not eligible for a bond hearing if subsection (c) applies—in such instances, the detention is mandatory. *See* 8 U.S.C. § 1226(a) ("Except as provided in subsection (c) . . . .").

Subsection (c) imposes mandatory detention on a narrow class of criminal aliens. The first paragraph requires officials to detain aliens who have committed one of the crimes listed in subparagraphs (A) through (D). These crimes include human trafficking, drug trafficking, crimes of moral turpitude, drug conspiracies, prostitution, firearm offenses, treason, espionage, and the like. *Id.* § 1226(c)(1)(A)–(D) (citing offenses listed in 8 U.S.C. §§ 1182, 1227).[3] The second paragraph then mandates

----

[3] An alien may challenge the application of mandatory detention. In that event, an immigration judge holds a *Joseph* hearing to determine whether the person is an alien who committed a relevant crime. *See Diop v. ICE/Homeland Sec.*, 656 F.3d 221, 230–31 (3d Cir. 2011) (citing *In re Joseph*, 22 I. & N. Dec. 799, 800 (B.I.A. 1999)). And even then, "the statute implicitly authorizes detention [only] for a reasonable amount of

that officials hold such aliens without a bond hearing unless a narrow witness-protection exception applies. That exception does not apply to Sylvain.

In recent years, the executive branch has concentrated its resources on criminal aliens—especially those subject to mandatory detention. The director of Immigration and Customs Enforcement stated in a 2011 memorandum that the agency's first priority was "[a]liens who pose . . . a risk to public safety." Memorandum from John Morton, Dir., U.S. Immigration & Customs Enforcement, on Civil Immigration Enforcement: Priorities for the Apprehension, Detention, and Removal of Aliens 1 (Mar. 2, 2011), http://www.ice.gov/doclib/news/releases/2011/110302washingtondc.pdf. This includes "aliens convicted of crimes, with a particular emphasis on violent criminals, felons, and repeat offenders." *Id.* at 2. The

time," after which immigration officials "must make an individualized inquiry into whether detention is still necessary to fulfill the statute's purposes of ensuring that an alien attends removal proceedings and that his release will not pose a danger to the community." *Id.* at 231; *see also Leslie v. Att'y Gen.*, 678 F.3d 265, 271 (3d Cir. 2012). In addition, the Supreme Court has upheld mandatory detention against a due-process challenge. *Kim*, 538 U.S. at 531.

memorandum instructed those within the agency to use "detention resources" for "aliens subject to mandatory detention by law." *Id.* at 3. One month after the director issued this document, immigration officials arrested Sylvain and imposed mandatory detention. Against this backdrop, we turn to the issues.

## III

As always, we must review the basis for jurisdiction. *Bender v. Williamsport Area Sch. Dist.*, 475 U.S. 534, 541 (1986) ("[E]very federal appellate court has a special obligation to satisfy itself not only of its own jurisdiction, but also that of the lower courts in a cause under review." (citation and quotation marks omitted)). The District Court had jurisdiction to grant Sylvain's habeas petition under 28 U.S.C. § 2241(a). In turn, we have jurisdiction to consider the government's appeal under 28 U.S.C. § 1291.

Nothing in 8 U.S.C. § 1226(e) prevents us from deciding whether the immigration officials had statutory authority to impose mandatory detention.[4] For one thing,

---

[4] According to 8 U.S.C. § 1226(e),

> The Attorney General's discretionary judgment regarding the application of this sec-

whether the officials had authority is not a "discretionary judgment." 8 U.S.C. § 1226(e). And if the officials lacked authority, they could not act "under [§ 1226]." *Id.*; *see Singh v. Holder*, 638 F.3d 1196, 1202 (9th Cir. 2011) ("[Section 1226(e)] does not limit habeas jurisdiction over constitutional claims or questions of law."); *Al-Siddiqi v. Achim*, 531 F.3d 490, 494 (7th Cir. 2008) ("[T]his section . . . does not deprive us of our authority to review statutory and constitutional challenges."); *cf. Kim*, 538 U.S. at 517 (concluding that it had jurisdiction to consider a constitutional challenge to the "statutory framework").

## IV

We turn next to the question presented: Do immigration officials lose their authority to impose mandatory detention if they fail to act "when the alien is released" from state or federal custody? For reasons that we will explain, the answer is no.

---

tion shall not be subject to review. No court may set aside any action or decision by the Attorney General under this section regarding the detention or release of any alien or the grant, revocation, or denial of bond or parole.

A

*Chevron* deference lurks in the background of this case. *Chevron, U.S.A. v. Natural Res. Def. Council*, 467 U.S. 837, 842–44 (1984). That doctrine requires us to defer to an agency's reasonable interpretations of ambiguous statutes. The Supreme Court has explained that the Board of Immigration Appeals must receive "deference as it gives ambiguous statutory terms 'concrete meaning through a process of case-by-case adjudication.'" *INS v. Aguirre-Aguirre*, 526 U.S. 415, 425 (1999) (quoting *INS v. Cardoza-Fonseca*, 480 U.S. 421, 448 (1987)); *see also Negusie v. Holder*, 555 U.S. 511, 516 (2009) (noting that the Board's interpretation of the Immigration and Nationality Act generally must receive deference); *Chen v. Ashcroft*, 381 F.3d 221, 224 (3d Cir. 2004).

Over a decade ago, the Board of Immigration Appeals concluded that mandatory detention does not require immediate detention. *In re Rojas*, 23 I. & N. Dec. 117, 125 (B.I.A. 2001). To reach that conclusion, the Board examined the phrase "an alien described in paragraph (1)" from paragraph (2) of the mandatory-detention statute. *Id.* at 120 (discussing 8 U.S.C. § 1226(c)(2)). The title of the paragraph is "[r]elease," but that title is something of a misnomer—after all, paragraph (2) is the portion of the statute that authorizes mandatory detention. The Board stated that "the literal language" of the

15

paragraph "does not unambiguously tell us whether it encompasses the 'when the alien is released' clause in [paragraph (1)] or merely references the four categories of aliens described in subparagraphs (A) through (D)." *Id.* After a lengthy discussion, it held that the phrase does not encompass the "when . . . released" clause. *Id.* at 121–25. This would mean that officials retain authority to impose mandatory detention even if they fail to act "when the alien is released."

The government agrees that the statute is ambiguous. In its view, we must defer to the Board's interpretation. The government has pressed this argument in district courts across the country—sometimes with success,[5] often without.[6] Only one other circuit has considered the

_____

[5] *See, e.g.*, *Khetani v. Petty*, 859 F. Supp. 2d 1036, 1038 (W.D. Mo. 2012); *Hernandez v. Sabol*, 823 F. Supp. 2d 266, 270–71 (M.D. Pa. 2011); *Diaz v. Muller*, No. 11-4029 (SRC), 2011 WL 3422856, at *2–3 (D.N.J. Aug. 4, 2011); *see also Saucedo-Tellez v. Perryman*, 55 F. Supp. 2d 882, 884–85 (N.D. Ill. 1999) (deferring to a Board decision that preceded *Rojas*).

[6] *See, e.g.*, *Valdez v. Terry*, 874 F. Supp. 2d 1262, 1264–66 (D.N.M. 2012); *Parfait v. Holder*, No. 11-4877 (DMC), 2011 WL 4829391, at *4–9 (D.N.J. Oct. 11, 2011); *Beckford v. Aviles*, No. 10-2035 (JLL), 2011 WL

issue. *Hosh v. Lucero*, 680 F.3d 375, 378–80 (4th Cir. 2012).[7] In that case, the Fourth Circuit agreed that the statute is ambiguous. The court focused on the word "when," noting that it might mean immediately, or it might mean sometime thereafter. *Id.* at 379–80 ("'[W]hen' in § 1226(c) can be read, on one hand, to re-

3515933, at \*7–9 (D.N.J. Aug. 9, 2011); *Gonzalez v. DHS*, No. 1:CV-10-0901, 2010 WL 2991396, at \*1 (M.D. Pa. July 27, 2010); *Dang v. Lowe*, No. 1:CV-10-0446, 2010 WL 2044634, at \*1–2 (M.D. Pa. May 20, 2010); *Khodr v. Adduci*, 697 F. Supp. 2d 774, 775, 777–80 (E.D. Mich. 2010); *Louisaire v. Muller*, 758 F. Supp. 2d 229, 236 (S.D.N.Y. 2010); *see also Alikhani v. Fasano*, 70 F. Supp. 2d 1124, 1130 (S.D. Cal. 1999) (concluding pre-*Rojas* that the statute requires immediacy).

[7] The District Court cited a First Circuit case in deciding not to defer. *See Saysana v. Gillen*, 590 F.3d 7 (1st Cir. 2009). That case, however, does not address the question at hand. The First Circuit instead faced a separate question: whether mandatory detention applies to an alien who committed a crime listed in § 1226(c)(1)(A)–(D) before the statute went into effect and then was released from a crime not listed in the statute after it went into effect. *See id.* at 16–18 & n.6.

fer to action or activity occurring 'at the time that' or 'as soon as' other action has ceased or begun. On the other hand, 'when' can also be read to mean the temporally broader 'at or during the time that,' 'while,' or 'at any or every time that.'" (citations and internal quotation marks omitted)).[8] Under the former reading, the alien was not detained "when . . . released" from state custody. Under

---

[8] Over two centuries ago, Chief Justice John Marshall discussed the same problem in a different statute:

> [M]uch depends on the true legislative meaning of the word "when." The plaintiffs in error contend that it designates the precise time when a particular act must be performed . . . ; the defendants insist that it describes the occurrence which shall render that particular act necessary. That the term may be used, and, either in law or in common parlance, is frequently used in the one or the other of these senses, cannot be controverted; and, of course, the context must decide in which sense it is used in the law under consideration.

*United States v. Willings*, 8 U.S. (4 Cranch) 48, 55 (1807).

the latter reading, he might have been. In light of this ambiguity, the Fourth Circuit deferred to the Board.[9]

We need not take a stand on this issue. Even if the statute calls for detention "when the alien is released," and even if "when" implies something less than four years, nothing in the statute suggests that immigration officials lose authority if they delay. The alleged ambiguity

---

[9] The Fourth Circuit emphasized that the word "when" is ambiguous. We believe that emphasis is a flaw in its *Chevron* analysis. *Chevron* requires deference to an agency's reasonable interpretation of specific "ambiguous terms." *Smiley v. Citibank (S.D.)*, 517 U.S. 735, 739–41 (1996). The specific term interpreted in *Rojas* is the phrase "an alien described in paragraph (1)." *Rojas*, 23 I. & N. Dec. at 120 (discussing 8 U.S.C. § 1226(c)(2)). The Board did not explicitly interpret the word "when." If anything, it suggested that "when" denotes immediacy. *See id.* at 122 ("The statute does direct the Attorney General to take custody of aliens immediately upon their release from criminal confinement."). Despite that, it concluded that officials can impose mandatory detention even if they delay because "an alien described in paragraph (1)"—and thus subject to detention—need not be one who was taken into custody "when . . . released." *Id.* at 125.

19

does not determine the outcome of this case, so we need not decide whether *Chevron* emerges from the background.

B

We reach this conclusion for a number of reasons. First and foremost is the text: the government's authority to impose mandatory detention does not depend on its compliance with the "when . . . released" deadline. The text states that immigration officials "shall take into custody any alien who [has committed various crimes] when the alien is released." 8 U.S.C. § 1226(c)(1). The text does not explicitly remove that authority if an alien has already left custody. We are loath to interpret a deadline as a bar on authority after the time has passed—even when the word "shall" appears in the text. *See Cyberworld Enter. Tech. v. Napolitano*, 602 F.3d 189, 197 (3d Cir. 2010).

This principle of statutory interpretation descends from a long line of Supreme Court precedents. *See, e.g.*, *Barnhart v. Peabody Coal Co.*, 537 U.S. 149, 161 (2003); *United States v. Nashville, C. & St. L. Ry.*, 118 U.S. 120, 125 (1886). In these cases, the Court has explained that "a statute directing official action needs more than a mandatory 'shall' before the grant of power can sensibly be read to expire when the job is supposed

20

to be done." *Barnhart*, 537 U.S. at 161. In other words, "a provision that the Government 'shall' act within a specified time, without more, [is not] a jurisdictional limit precluding action later." *Id.* at 158, 161–63 (concluding that a provision stating that the government "shall" make certain assignments by "October 1, 1993," did not eliminate the government's authority to make assignments after that date).

Bureaucratic inaction—whether the result of inertia, oversight, or design—should not rob the public of statutory benefits. The Tenth Circuit has called this "the better-late-than-never principle." *United States v. Dolan*, 571 F.3d 1022, 1027 (10th Cir. 2009), *aff'd sub nom. Dolan v. United States*, 130 S. Ct. 2533 (2010). "Congress imposes deadlines on other branches of government to prod them into ensuring the timely completion of their statutory obligations to the public, not to allow those branches the chance to avoid their obligations just by dragging their feet." *Id.* The court noted that "[i]t would be a strange thing indeed if a bureaucracy or court could avoid a congressional mandate by unlawful delay." *Id.*

We recently applied this principle in the immigration context. *See Cyberworld*, 602 F.3d at 196–200. In that case, we concluded that the government did not lose authority to fine a company for alleged violations of the Immigration and Nationality Act simply because the

government had failed to act within a thirty-day deadline. *Id.* at 196; *cf. Brock v. Pierce Cnty.*, 476 U.S. 253, 266 (1986) (holding that the Secretary of Labor did not lose authority to recover funds despite his failure to comply with the requirement that he "shall" act "within 120 days"); *Dolan*, 130 S. Ct. at 2539 ("The fact that a sentencing court misses the [Mandatory Victims Restitution Act's] 90-day deadline . . . does not deprive the court of the power to order restitution.").

The closest analog to the present dispute is a case from two decades ago. *United States v. Montalvo-Murillo*, 495 U.S. 711 (1990). There, the Supreme Court interpreted the Bail Reform Act of 1984, 18 U.S.C. § 3142. This Act allows the government to detain defendants leading up to their trial if they pose a risk of fleeing or a danger to others. *Id.* § 3142(e)–(f). Importantly, before the government can detain anyone under the Act, a judicial officer "shall" hold a bond hearing "immediately upon the person's first appearance before the [ ] officer" to assess the person's flight risk and danger. *Id.* § 3142(f)(2). Guadelupe Montalvo-Murillo did not receive a hearing upon his first appearance; he instead received one a few days later. He argued that the delay stripped the government of authority to detain him under the Act. The Supreme Court rejected this argument:

22

> We hold that a failure to comply with the first appearance requirement does not defeat the Government's authority to seek detention of the person charged. . . . There is no presumption or general rule that for every duty imposed upon the court or the Government and its prosecutors there must exist some corollary punitive sanction for departures or omissions, even if negligent. In our view, construction of the Act must conform to the great principle of public policy, applicable to all governments alike, which forbids that the public interests should be prejudiced by the negligence of the officers or agents to whose care they are confided.

*Montalvo-Murillo*, 495 U.S. at 717–18 (citations and quotation marks omitted).

The same is true of mandatory detention. Like the Bail Reform Act, the mandatory-detention statute allows the government to detain a person in the days leading up to a legal proceeding. Both statutes have two prerequisites—one that focuses on timing, the other on the person in custody. Under the Bail Reform Act, the government must conduct a hearing "immediately upon the person's first appearance," and the defendant must pose either a flight risk or danger to the public. 18 U.S.C. § 3142(f)(2).

23

Under the mandatory-detention statute, the government must detain the alien "when . . . released," and the alien must have committed one of the listed crimes. 8 U.S.C. § 1226(c)(1). Importantly, neither statute explicitly ties the government's authority to the time requirement. As a result, the government retains authority under both statutes despite any delay.

This is particularly so because an important public interest is stake. *See Brock*, 476 U.S. at 260 ("[P]ublic interests should [not] be prejudiced by the negligence of the officers or agents to whose care they are confided." (quoting *Nashville, C. & St. L. Ry.*, 118 U.S. at 125)). Congress adopted the mandatory-detention statute against a backdrop of rising crime by deportable aliens. *Kim*, 538 U.S. at 518. According to one study, "after criminal aliens were identified as deportable, 77% were arrested at least once more and 45%—nearly half—were arrested multiple times before their deportation proceedings even began." *Id.* at 518–19. To make matters worse, many aliens failed to show up at their deportation proceedings. Prior to mandatory detention, the Attorney General could release aliens on bond if they did not "present an excessive flight risk or threat to society." *Id.* at 519. Even so, "more than 20% of deportable criminal aliens failed to appear for their removal hearings." *Id.* In light of these problems, Congress eliminated all discretion. The resulting statute promotes the public interest by keeping the

24

most dangerous aliens off the streets.

To be sure, immigration officials should act without delay. The sooner they detain dangerous aliens, the safer the public will be. But government officials are neither omniscient nor omnipotent. "Assessing the situation in realistic and practical terms, it is inevitable that, despite the most diligent efforts of the Government and the courts, some errors in the application of the time requirements . . . will occur." *Montalvo-Murillo*, 495 U.S. at 720. And so we see "no reason to bestow upon [aliens] a windfall and to visit upon the Government and the citizens a severe penalty" by mandating a bond hearing "every time some deviation from the strictures of [the statute] occurs." *Id.*

In fact, the public-interest rationale is even stronger in this context. After all, the Bail Reform Act protects both the public and the defendant—the former by allowing detention, the latter by allowing release if the defendant does not pose a flight risk or danger to the public. In contrast, the mandatory-detention statute is intended to protect only the public—detention is mandatory, no matter the perceived flight risk or danger. For that reason, "[t]he *Montalvo-Murillo* holding" is "doubly persuasive in the instant setting." *Hosh*, 680 F.3d at 382–83.

25

Nevertheless, Sylvain tries to escape the reaches of *Montalvo-Murillo*. He argues that his claim is distinguishable for two reasons. First, he points out that the defendant in *Montalvo-Murillo* asked for a release from jail, whereas Sylvain merely asked for a bond hearing. We recognize that is a distinction between these cases. But in the ways that matter, the cases are alike. Indeed, the ultimate question in both cases is whether a person *might* be eligible for a release despite some lapsed deadline. Under the Bail Reform Act, defendants are ineligible for a release as long as they pose a flight risk or a danger to the public. *See Montalvo-Murillo*, 495 U.S. at 721. And the same is true under the mandatory-detention statute. Deportable aliens are ineligible for a release as long as they have committed a crime listed in § 1226(c)(1), which serves as a proxy for flight risk and danger. The requested relief is a distinction without a difference.

Next, Sylvain argues that the statute "specif[ies] a consequence for noncompliance with [the] statutory timing provision[]." *United States v. James Daniel Good Real Prop.*, 510 U.S. 43, 63 (1993). In particular, the consequence is a bond hearing. Sylvain cites § 1226(a), which states that deportable aliens are eligible for a hearing "[e]xcept as provided in subsection (c)." He contends that if immigration officials fail to detain an alien "when . . . released," the alien's detention is no longer "provided in subsection (c)," but instead falls

26

within subsection (a).

The first problem with this argument is that the language in subsection (a) does not explicitly invoke subsection (c)'s time requirement. In past cases, the Supreme Court has insisted on clear language. For example, the Speedy Trial Act requires a trial within seventy days of a defendant's plea. 18 U.S.C. § 3161(c)(1). It further states that an "indictment shall be dismissed on motion" if "a defendant is not brought to trial within the time limit." *Id.* § 3162(a)(2). That language explicitly ties the dismissal to the seventy-day deadline. *See Zedner v. United States*, 547 U.S. 489, 507–08 (2006). In contrast, the Bail Reform Act suggests that the consequence of not conducting "a hearing pursuant to . . . subsection (f)" is that the government loses authority to detain a defendant. 18 U.S.C. § 3142(e)(1). Although the statute's time requirement appears in subsection (f), the Court concluded that the government's authority did not turn on its punctuality—in part because the "pursuant to" language merely was an oblique reference to the time requirement. *See Montalvo-Murillo*, 495 U.S. at 717–19.[10]

---

[10] The absence of explicit language in the mandatory-detention statute is particularly telling. After all, Congress created mandatory detention in the wake of *Brock*, which clearly embraced the better-late-than-never

In addition to this textual problem, Sylvain's argument runs afoul of plain logic. Congress designed the statute to keep dangerous aliens off the streets. *See Kim*, 538 U.S. at 518–22. The statute does so by eliminating discretion, thereby preventing the release of those aliens who are most likely to skip town and to continue breaking the law. *Id.*; *Diop v. ICE/Homeland Sec.*, 656 F.3d 221, 231–32 (3d Cir. 2011). Sylvain's interpretation would lead to an outcome contrary to the statute's design: a dangerous alien would be eligible for a hearing—which could lead to his release—merely because an official missed the deadline.[11] This reintroduces discretion into

principle. *Brock*, 476 U.S. at 260; *see Barnhart*, 537 U.S. at 160 (concluding that a time requirement in the Coal Act was not jurisdictional because it "was adopted six years after *Brock* came down, when Congress was presumably aware that we do not readily infer congressional intent to limit an agency's power to get a mandatory job done merely from a specification to act by a certain time").

[11] Of course, an alien would not be eligible for a release if the immigration officer determined that he posed a flight risk or danger to the public. But as the Supreme Court explained in *Kim*, immigration officers

the process and bestows a windfall upon dangerous criminals. *Cf. Montalvo-Murillo*, 495 U.S. at 719–20 ("Our conclusion is consistent with the design and function of . . . the Bail Reform Act . . . [which is] an appropriate regulatory device to assure the safety of persons in the community and to protect against the risk of flight."). For these reasons, the officials' four-year delay—however regrettable—did not eliminate their authority to impose mandatory detention on Sylvain.

In a final effort to avoid mandatory detention, Sylvain raises a novel argument in his brief—one that we dispatch in short order. He claims that the conditional discharge following his 2007 conviction was not a "release[]" within the meaning of the "when . . . released" clause. But Sylvain never raised this argument in the District Court. *See Freeman v. Pittsburgh Glass Works, LLC*, 709 F.3d 240, 249 (3d Cir. 2013) ("We generally refuse to consider issues that the parties have not raised below."). In any event, his release from the 2007 arrest that led to his conviction and conditional discharge certainly fulfilled the release requirement, *see In re Kotliar*, 24 I. & N. Dec. 124, 125 (B.I.A. 2007); *In re West*, 22 I. & N. Dec. 1405, 1410 (B.I.A. 2000)—to say nothing of

often underestimate those risks, which is why Congress eliminated their discretion. *See* 538 U.S. at 518–19.

29

whether the conditional discharge did the same.

\* \* \*

We conclude that Sylvain is subject to mandatory detention. Our holding rests on a simple observation: even if the statute calls for detention "when the alien is released," and even if "when" implies some period of less than four years, nothing in the statute suggests that officials lose authority if they delay. With this holding, we neither condone government indolence nor express approval for the delay in this case. But as the Supreme Court has explained in a related context, "[t]he end of exacting compliance with the letter of [the statute] cannot justify the means of exposing the public to an increased likelihood of violent crime by persons on bail, an evil the statute aims to prevent." *Montalvo-Murillo*, 495 U.S. at 720. Accordingly, we will reverse the District Court's judgment.[12]

---

[12] Our decision effectively denies Sylvain's original habeas petition and thus makes him ineligible for a bond hearing under § 1226(a). Although Sylvain has already received such a hearing and was released on bond, our holding sets aside that proceeding.

30