**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**March 24, 2015**

**Elisabeth A. Shumaker**
**Clerk of Court**

<u>**PUBLISH**</u>

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

MANUEL OLMOS,

      Petitioner-Appellee,

v.

ERIC H. HOLDER, JR., United States
Attorney General,

      Respondent-Appellant.

---

ASIAN AMERICANS ADVANCING
JUSTICE; ASIAN AMERICANS
ADVANCING JUSTICE-ASIAN LAW
CAUCUS; DETENTION WATCH
NETWORK; FAMILIES FOR
FREEDOM; IMMIGRANT RIGHTS
CLINIC; IMMIGRATION
EQUALITY; THE ROCKY
MOUNTAIN IMMIGRANT
ADVOCACY NETWORK; THE
UNIVERSITY OF COLORADO
BOULDER LAW SCHOOL
CRIMINAL/IMMIGRATION
DEFENSE CLINIC; THE
UNIVERSITY OF DENVER STURM
COLLEGE OF LAW HYBRID
IMMIGRATION PROGRAM,

      Amici Curiae.

No. 14-1085

**Appeal from the United States District Court
for the District of Colorado
(D.C. No. 1:13-CV-03158-RM)**

Hans H. Chen, Trial Attorney, U.S. Department of Justice, Civil Division, Office of Immigration Litigation, Washington, D.C. (Stuart F. Delery, Assistant Attorney General, U.S. Department of Justice, Civil Division, Colin A. Kisor, Acting Director, Office of Immigration Litigation, District Court Section, Jeffrey S. Robins, Assistant Director, Office of Immigration Litigation, Washington, D.C., with him on the briefs), for Respondent-Appellant.

Michael K. T. Tan, American Civil Liberties Foundation Immigrants' Rights Project, San Francisco, California (Eunice Lee, American Civil Liberties Foundation Immigrants' Rights Project, San Francisco, California, Judy Rabinovitz, American Civil Liberties Foundation Immigrants' Rights Project, New York, New York, and Mark Silverstein, ACLU of Colorado, Denver, Colorado, with him on the brief), for Petitioner-Appellee.

Jon Streeter, Stacy Chen, and Theresa H. Nguyen, Keker & Van Nest LLP, San Francisco, California, filed an Amici Curiae brief for Asian Americans Advancing Justice and AAJC and Asian Americans Advancing Justice-Asian Law Caucus.

Alina Das, Washington Square Legal Services, Inc., Immigrant Rights Clinic, New York, New York, filed an Amici Curiae brief for Detention Watch Network, Families for Freedom, Immigrant Rights Clinic, Immigration Equality, The Rocky Mountain Immigrant Advocacy Network, The University of Colorado Boulder Law School Criminal/Immigration Defense Clinic, and the University of Denver Sturm College of Law Hybrid Immigration Program.

Before **BRISCOE**, Chief Judge, **HOLMES**, and **BACHARACH**, Circuit Judges.

**BACHARACH**, Circuit Judge.

For aliens, a criminal conviction can often result in removal (deportation). When an alien is convicted and the federal government seeks removal, an immigration judge can ordinarily conduct a bond hearing to decide whether the alien should be released or detained while he waits for his removal hearing. But, in 8 U.S.C. § 1226(c), Congress has required detention (without a bond hearing) for some categories of aliens. These aliens must be taken into custody by the United States Attorney General when they are released in their criminal cases.

Against the backdrop of this statutory framework, Mr. Manuel Olmos (a citizen of Mexico) was convicted in state court on charges involving identity theft, providing false information to a pawnbroker, and forgery of a government document. Mr. Olmos obtained probation, but was taken into federal custody six days later on the ground that his conviction triggered mandatory detention.

Mr. Olmos sought a writ of habeas corpus, arguing that he was entitled to a bond hearing, where he could seek release while his removal hearing was pending. The district court agreed with Mr. Olmos and granted a writ of habeas corpus, holding that he was entitled to a bond hearing. At the eventual bond hearing, Mr. Olmos was released on a $12,000 bond.

The government contends that the Attorney General had a statutory duty to detain Mr. Olmos (without a bond hearing) notwithstanding his six-day gap in custody. We agree with the government based on (1) deference to the way the

3

Board of Immigration Appeals has interpreted § 1226(c) and (2) the continued duty to impose mandatory detention even if the Attorney General had waited too long to take custody of Mr. Olmos. For both reasons, we reverse.

## I. Jurisdiction

Though Mr. Olmos does not challenge jurisdiction, we must address the issue sua sponte. *Weber v. GE Grp. Life Assurance Co.*, 541 F.3d 1002, 1009 (10th Cir. 2008).

We would lack jurisdiction if the Attorney General had discretion in applying 8 U.S.C. § 1226. *See* 8 U.S.C. § 1226(e) (2012). But, Mr. Olmos is not challenging a discretionary decision, for the Attorney General has disclaimed any discretion in mandatory detention. Thus, we have jurisdiction over the government's appeal. *See Sylvain v. Attorney Gen.*, 714 F.3d 150, 155 (3d Cir. 2013) ("Nothing in 8 U.S.C. § 1226(e) prevents us from deciding whether the immigration officials had statutory authority to impose mandatory detention.").

## II. Statutory Interpretation (the Statutory Reference to "Paragraph (1)")

We must exercise this jurisdiction by deciding the extent of the Attorney General's authority. This authority is governed by two parts of 8 U.S.C. § 1226(c), which are entitled "Custody" and "Release." The first part (entitled "Custody") states that the Attorney General must take custody of certain aliens "when . . . released." 8 U.S.C. § 1226(c)(1) (2012). The second part (entitled

"Release") restricts the Attorney General's authority to release aliens described in the first part. 8 U.S.C. § 1226(c)(2) (2012).

We must decide whether this restriction applies when there is a gap between expiration of the criminal sentence and confinement by the Attorney General. Mr. Olmos states that the restriction does not apply when there is a gap in custody; the government states that the restriction applies regardless of when the Attorney General takes the alien into custody.

## A.    *Chevron* Analysis

The Board of Immigration Appeals agreed with the government's interpretation, concluding that the statutory restriction on release applies even when there is a gap in custody. *In re Rojas*, 23 I. & N. Dec. 117, 125 (B.I.A. 2001). To decide whether we should defer to the Board, we engage in a two-part inquiry under *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984). The first step is to determine "whether Congress has directly spoken" on the issue. *Chevron, U.S.A., Inc.*, 467 U.S. at 842. If Congress has directly spoken, we do not accord any deference to the Board's interpretation. *Id.* at 842-43. But, if Congress has not directly spoken on the issue, we must decide if the Board's interpretation is permissible. *Id.* at 843.

5

**B.      The First Step of *Chevron*: Whether Congress Has Directly Spoken**

To determine whether Congress has directly spoken, we consider the statutory text and other clues regarding Congress's meaning.

**1.      The Statutory Text**

We begin with the statutory language:

(1)      Custody

The Attorney General shall take into custody any alien who–

(A)      is inadmissible by reason of having committed any offense covered in section 1182(a)(2) of this title,

(B)      is deportable by reason of having committed any offense covered in section 1227(a)(2)(A)(ii), (A)(iii), (B), (C), or (D) of this title,

(C)      is deportable under section 1227(a)(2)(A)(i) of this title on the basis of an offense for which the alien has been sentence [sic] to a term of imprisonment of at least 1 year, or

(D)      is inadmissible under section 1182(a)(3)(B) of this title or deportable under section 1227(a)(4)(B) of this title,

when the alien is released, without regard to whether the alien is released on parole, supervised release, or probation, and without regard to whether the alien may be arrested or imprisoned again for the same offense.

(2)      Release

The Attorney General may release an alien described in paragraph (1) only if the Attorney General decides pursuant to section 3521 of title 18 that release of the alien from custody is necessary to provide protection to a witness, a potential witness, a person cooperating with an investigation into major criminal activity, or an immediate family

6

member or close associate of a witness, potential witness, or person cooperating with such an investigation, and the alien satisfies the Attorney General that the alien will not pose a danger to the safety of other persons or of property and is likely to appear for any scheduled proceeding. A decision relating to such release shall take place in accordance with a procedure that considers the severity of the offense committed by the alien.

8 U.S.C. § 1226(c) (2012).

The text makes clear that the Attorney General must take custody of aliens in four categories ("A" through "D" of Paragraph "1") when they are released. Mr. Olmos argues that the Attorney General must exercise this statutory obligation immediately upon release from confinement in the criminal case. For the sake of argument, we may assume that Mr. Olmos is correct.

If Mr. Olmos is correct, he should have been kept in continuous custody, with the Attorney General taking custody immediately upon release in the state criminal case. That did not happen, for Mr. Olmos had six days of freedom before being taken into the Attorney General's custody. Thus, we must ask: Did the Attorney General lose this power through his six-day delay?

To answer this question, we turn to the statutory text. It provides the Attorney General with limited power to release aliens, stating: "The Attorney General may release an alien described in paragraph (1) only if" certain conditions are met. 8 U.S.C. § 1226(c)(2) (2012). What does it mean to be "an alien described in paragraph (1)"? Mr. Olmos states that this phrase refers to

7

aliens in Paragraphs "A" through "D" only if they are taken into custody immediately upon release in their criminal cases; the government states that the phrase refers to aliens in Paragraphs "A" through "D" regardless of when they are taken into the Attorney General's custody.

Both interpretations are plausible because the statutory text is ambiguous in its reference to "an alien described in paragraph (1)." *Id.* This phrase may refer solely to aliens in Paragraphs "A" through "D," as the government says. Or, the phrase may refer to these aliens only when they are taken into immediate custody, as Mr. Olmos says. The answer lies in what it means to be "an alien described in paragraph (1)." *Id.* To interpret this phrase, we must go beyond the statutory text.

### 2.    Other Clues Regarding the Correct Interpretation

To do so, we use "traditional tools of statutory construction." *Anderson v. U.S. Dep't of Labor*, 422 F.3d 1155, 1180 (10th Cir. 2005). In this case, the parties point to tools of statutory construction involving grammatical structure, legislative history, generality of the statutory cross-reference to "paragraph (1)," and case law on the interpretation of "flush language." These tools do not remove the existing ambiguity in the statute, for none definitively answer whether the reference to "paragraph (1)" incorporates the taking of custody "when the alien is released."

### a.  Grammatical Structure

The government points to the grammatical structure of § 1226(c), requiring us to interpret two phrases:

1.  "when the alien is released," and

2.  "an alien described in paragraph (1)."

The government states that the first phrase ("when the alien is released") is an adverbial phrase, which must modify a verb rather than a noun. Thus, according to the government, a grammarian could reasonably conclude that the noun phrase ("an alien described in paragraph (1)") could not be modified by an adverbial clause ("when the alien is released"). But, this argument begs the question: The phrase "when the alien is released" can be adjectival or adverbial, depending on its function in the sentence. As a result, the grammar does not remove the inherent ambiguity in § 1226(c)(1).

This section contains three parts:

1.  the opening phrase ("The Attorney General shall take into custody any alien who–")

2.  the middle part ("A" through "D," referring to the reasons that a given alien might be considered "inadmissible" or "deportable")

3.  the end phrase ("when the alien is released" without regard to the form of release or potential reincarceration for the same offense).

9

The end phrase can modify (1) the opening phrase (by describing the aliens who are to be taken into custody), or (2) the middle part (by describing the aliens considered inadmissible or deportable).

If the end phrase simply modifies the opening phrase, the government's interpretation would be correct. But, this is not the only possible reading: The end phrase can also be read as modifying the middle part (by clarifying the aliens who are identified in Paragraphs "A" through "D"). Under this interpretation, Mr. Olmos would prevail because aliens would be described in Paragraph "1" only if they were immediately taken into custody upon release in their criminal cases. Because either interpretation is plausible from the text alone, the government's grammatical characterization does not remove the ambiguity.

### b.    Legislative History

The government relies not only on the grammar, but also on the legislative history. In adopting § 1226(c), Congress sought to reduce the risk of nonappearance for aliens who had committed crimes. *See* S. Rep. No. 104-48, at 23 (1995) ("Many criminal aliens who are released pending their deportation never appear for their deportation proceedings."). Thus, the government argues that Congress would have preferred reincarceration to ensure appearance at the removal hearing — regardless of whether there had been a gap in custody.

10

But, again, the government's reliance on congressional intent does not remove the ambiguity. Congress did not impose mandatory detention for all aliens guilty of crimes. Instead, Congress drew lines, imposing mandatory detention for some aliens and not for others. Congress could conceivably have been less concerned about the appearance of aliens who had been released and had not taken the opportunity to flee. Thus, the government's reliance on congressional intent does not remove the inherent ambiguity: Congress might or might not have wanted bond hearings for aliens like Mr. Olmos who had not fled after obtaining release.

### c.　　Generality in the Statutory Cross-Reference to "Paragraph (1)"

Mr. Olmos points to other statutory clues. For example, he emphasizes that Congress referred to aliens "described in paragraph (1)" and that this paragraph went beyond identifying aliens considered "inadmissible" or "deportable." The paragraph also directed the Attorney General to take custody of these aliens (the opening phrase) and told him when to do that ("when the alien is released"). Mr. Olmos argues that when Congress referred to aliens "described in paragraph (1)," Congress had to be referring to the entirety of Paragraph "1." And, the entirety of Paragraph "1" contemplated continuous confinement of aliens identified in "A" through "D."

11

To Mr. Olmos, the meaning is clear: If Congress wanted to focus exclusively on aliens identified in Paragraphs "A" through "D," the statute would have referred to aliens "described in paragraph (1)(A)-(D)" instead of aliens "described in paragraph (1)." In fact, Congress elsewhere used this kind of specific citation form when it intended to refer to a specific subsection. For example, in § 1226(d)(2), Congress referred to "[t]he record under paragraph (1)(C)." Mr. Olmos points out that Congress could easily have used the same specific form of citation (referring to aliens "described in paragraph (1)(A)-(D)") if the intent was to focus on "A" through "D" regardless of when the aliens had been released.

But, the government points out that Congress has not always been consistent in how it refers to other subsections in the same statute. For example, in 8 U.S.C. § 1153(b)(5)(B)(i), Congress referred broadly to "subparagraph (A)" even though the context showed that Congress was referring to only two subparts of "subparagraph (A)": (i) and (ii). Thus, Congress's reference to "paragraph (1)"—rather than "paragraph (1)(A)-(D)"—might not have reflected an intent to incorporate the end phrase ("when the alien is released").

### d.    The Interpretation of "Flush Language"

Mr. Olmos also points to case law on how to interpret "flush language." As noted above, § 1226(c)(1) consists of three parts: an opening phrase (directing the

Attorney General to take custody of aliens), the middle part (identifying the aliens who are to be taken into custody), and the end phrase ("when the alien is released"). The first and third parts of § 1226(c)(1) are considered "flush," meaning they begin at the left margin on the page. The middle part (Paragraphs "A" through "D") consists of "inset clauses," meaning they are indented. As Mr. Olmos points out, some courts state that "flush" language is intended to refer to the entire section. *See Snowa v. Comm'r of Internal Revenue*, 123 F.3d 190, 196 n.10 (4th Cir. 1997); *Reser v. Comm'r of Internal Revenue*, 112 F.3d 1258, 1262 n.10 (5th Cir. 1997); *Sherwin-Williams Co. Emp. Health Plan Trust v. Comm'r of Internal Revenue*, 330 F.3d 449, 454 n.4 (6th Cir. 2003).

But, these cases do not remove the ambiguity in whether the flush language ("when the alien is released") was intended to qualify the list of aliens identified in "A" through "D." As noted above, there are two flush clauses in § 1226(c)(1). Mr. Olmos has focused on the second flush clause ("when the alien is released"). But, there is also another "flush clause": "The Attorney General shall take into custody any alien who–." No one suggests that this clause could be used to describe the aliens listed in "A" through "D."

The two "flush" clauses might simply be read as two parts of a cohesive sentence. The sentence would read: "The Attorney General shall take into custody any alien who–[is identified in 'A' through 'D'] when the alien is released . . . ."

13

8 U.S.C. § 1226(c)(1) (2012). Thus, case law on the use of "flush language" does not remove the inherent ambiguity in the reference to aliens "described in paragraph (1)."

### e. Canon of Constitutional Avoidance

Mr. Olmos argues that § 1226(c) is unambiguous because the Board's interpretation would create serious constitutional questions. This argument does not advance the inquiry at step one of *Chevron*.

The problem with the argument is that it reflects a misapplication of the canon of constitutional avoidance. This canon provides that when a particular construction would raise serious constitutional problems, the court will avoid that construction unless doing so would plainly conflict with Congress's intent. *Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575 (1988). As Mr. Olmos states, this canon provides "'a tool for choosing between competing plausible interpretations of a statutory text.'" *Clark v. Martinez*, 543 U.S. 371, 381 (2005), *quoted in* Appellee's Resp. Br. at 34.

But, at the first step of *Chevron*, we examine solely "whether Congress has directly spoken to the precise question at issue." *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842 (1984). Thus, the canon of constitutional avoidance does not bear on our inquiry at step one. *See Warger v.*

14

*Shauers*, __ U.S. __, 135 S. Ct. 521, 529 (2014) (stating that the canon of constitutional avoidance applies only if the statute is ambiguous).

### f.    Rule of Lenity

According to Mr. Olmos, the rule of lenity suggests that the statute is unambiguous. We disagree.

Mr. Olmos invokes lenity at step one, where we are determining only whether Congress has directly spoken. *See* Appellee's Resp. Br. at 33-37. But, the rule of lenity applies only if the statute is grievously ambiguous. *Robers v. United States*, __ U.S. __, 134 S. Ct. 1854, 1859 (2014). Section 1226(c) can be grievously ambiguous only if Congress failed to directly speak on the issue. Thus, Mr. Olmos's invocation of lenity at step one is self-defeating: Lenity can apply only if the government has satisfied *Chevron*'s first step by showing ambiguity in the statute.

### g.    Interplay Between Paragraphs "1" & "2"

Mr. Olmos also points to the structure of Paragraphs "1" and "2" in § 1226(c). Paragraph "1" is entitled "Custody"; Paragraph "2" is entitled "Release." Based on these titles, Mr. Olmos argues that it would be odd if the rules of custody were to be found in Paragraph "2," where one would expect to find the rules governing release. Mr. Olmos adds that this oddity is heightened by the language in Paragraph "2," which addresses limitations on the Attorney

15

General's power to "release an alien described in paragraph (1)." 8 U.S.C. § 1226(c)(2) (2012). An alien can be released only if he is already in custody. Thus, Mr. Olmos argues that Paragraph "2" cannot serve as the sole provision authorizing the Attorney General to take an alien into custody. But, it isn't.

That authority also arises in Paragraph "1." There the statute requires the Attorney General to take aliens into custody if they are covered by categories "A" through "D." 8 U.S.C. § 1226(c)(1) (2012). As Mr. Olmos points out, the Attorney General must exercise this responsibility "when the alien is released." *Id.* But, what happens when the Attorney General fails to take aliens into custody when they are released? The government argues that apart from § 1226(c)(2), the Attorney General had an ongoing duty to take custody.

That interpretation is plausible,[1] making Mr. Olmos's argument irrelevant because the authority for mandatory detention would arise under § 1226(c)(1), not § 1226(c)(2). With the alien in the Attorney General's custody under his delayed enforcement of § 1226(c)(1), there would be nothing odd about § 1226(c)(2)'s restrictions on when the alien can be released. Thus, Mr. Olmos's reliance on the structure and titles in § 1226(c) does not remove the ambiguity on whether the reference to Paragraph "1" incorporates the phrase "when the alien is released."

---

[1]     *E.g.*, *Barnhart v. Peabody Coal Co.*, 537 U.S. 149, 158-59 (2003); *Brock v. Pierce Cnty.* 476 U.S. 253, 260 (1986).

**h.    Summary**

The text, the statutory clues, and canons of interpretation do not definitively clarify the meaning of § 1226(c). Even with the statutory text, clues, and canons, a reader cannot tell from the text alone whether aliens remain subject to mandatory detention after a gap in custody.

**C.    The Second Step of *Chevron*: Whether the Board's Statutory Interpretation Was Permissible**

Because Congress has not directly spoken on the issue, we consider how the Board of Immigration Appeals interpreted the statute and decide whether this interpretation was permissible. *See* p. 5, above. The Board's interpretation is permissible unless it is "arbitrary, capricious, or manifestly contrary to" § 1226(c). *Berneike v. Citimortgage, Inc.*, 708 F.3d 1141, 1148 (10th Cir. 2013).

As noted above, the Board held in *In re Rojas*, 23 I. & N. Dec. 117, 125 (B.I.A. 2001) that § 1226(c) required mandatory detention of aliens listed in "A" through "D" regardless of gaps in confinement. This interpretation is permissible.

**1.    The Alleged Irrationality of *Rojas***

Mr. Olmos and amici curiae contend that *Rojas* leads to unjust, irrational results, uprooting aliens from the community when they are the family's sole source of income, eligible for relief from removal, and tied to family in the United States. This contention overlooks Congress's policy determination that aliens in certain categories (Paragraphs "A" through "D") must be detained

17

without a bond hearing even when they are the family's sole source of income, are eligible for relief from removal, and have family ties in the United States. The Board of Immigration Appeals is not free to second-guess Congress's policy judgment; the Board's sole task was to determine whether Congress had intended to exempt aliens from mandatory detention when the Attorney General was slow to act. The alleged hardships flow from Congress's policy judgment, not from the Board's interpretation of the statute in *Rojas*.

## 2. The Rule of Lenity and Canon of Constitutional Avoidance

As discussed above, Mr. Olmos argued at step one of *Chevron* that § 1226 is unambiguous based on the rule of lenity and the canon of constitutional avoidance. These arguments are misguided because lenity and constitutional avoidance come into play only if the statute is ambiguous. Though Mr. Olmos does not address lenity or constitutional avoidance at step two of *Chevron*, we do so to ensure the Board's interpretation would not run afoul of well accepted principles of statutory interpretation. They wouldn't.

### a. The Canon of Constitutional Avoidance

The canon of constitutional avoidance would not preclude the Board's interpretation of § 1226. As noted above, this canon provides a method of choosing between otherwise plausible interpretations of a statute. *See* p. 14, above. At step two of *Chevron*, we are simply determining whether an agency's

18

interpretation is permissible. *See* p. 5, above. An agency's interpretation may be permissible even if it would create constitutional issues. *See Morales-Izquierdo v. Gonzales*, 486 F.3d 484, 493 (9th Cir. 2007) (en banc).[2]

"[W]e do not abandon *Chevron* deference at the mere mention of a possible constitutional problem,"[3] and the Supreme Court has upheld the constitutionality of mandatory detention in *Demore v. Kim*, 538 U.S. 510, 531 (2003). Amici Asian Americans Groups argue that the Supreme Court's decision in *Demore* does not apply because there the alien's confinement was continuous. This argument is not correct. The Supreme Court did not state whether there had been a gap in custody. But, the Ninth Circuit Court of Appeals did, noting that the Attorney General had taken the alien into custody one day after his release. *Kim v. Ziglar*, 276 F.3d 523, 526 (9th Cir. 2002) ("The day after his release from state custody, the

---

[2]     There the Ninth Circuit Court of Appeals stated:

> When Congress has explicitly or implicitly left a gap for an agency to fill, and the agency has filled it, we have no authority to re-construe the statute, even to avoid potential constitutional problems; we can only decide whether the agency's interpretation reflects a plausible reading of the statutory text . . . . [T]he constitutional avoidance doctrine . . . plays no role in the second *Chevron* inquiry.

*Morales-Izquierdo v. Gonzales*, 486 F.3d 484, 493 (9th Cir. 2007) (en banc) (internal citation omitted).

[3]     *Nat'l Mining Ass'n v. Kempthorne*, 512 F.3d 702, 711 (D.C. Cir. 2008).

19

Immigration and Naturalization Service . . . detained Kim pursuant to 8 U.S.C. § 1226(c)(1)(B) . . . ."), *rev'd sub nom. Demore v. Kim*, 538 U.S. 510 (2003).

Mr. Olmos had six days of freedom, rather than one, after being released on probation in his criminal case.[4] But, there is nothing in the Supreme Court's decision that would cast doubt on the constitutionality of mandatory detention for someone who had enjoyed six days (rather than one day) of freedom.

According to Mr. Olmos, *Demore* does not apply because it "involved a constitutional challenge brought by a noncitizen who conceded § 1226(c)'s applicability to him." Appellee's Resp. Br. at 32 n.13 (citing *Demore v. Kim*, 538 U.S. 510, 522 (2003)). But, this fact does not distinguish *Demore*. There the alien did not deny that he was "deportable" under § 1226(c). *Demore*, 538 U.S. at 522 ("Nor did he argue that he himself was not 'deportable' within the meaning of

---

[4]    Mr. Olmos contends that the gap in custody was four months rather than six days. This contention is incorrect.

The parties apparently agree that physical custody is required to trigger § 1226(c): Otherwise, how could the alien be "released"? Mr. Olmos argues that the physical custody must be ordered as part of the sentence; the government contends that the physical custody can take place when the alien is arrested. We need not decide this issue because it was forfeited in district court. *See* pp. 26-29, below. But, both parties acknowledge that the Attorney General could not have taken custody until Mr. Olmos was sentenced to probation in his state criminal cases. That sentence was imposed six days before the Attorney General took custody of Mr. Olmos. Thus, the Attorney General's delay spanned six days—not four months.

20

§ 1226(c).”). But, that is also true here, for Mr. Olmos has not denied that he is "deportable" for conviction of a crime involving moral turpitude.

Mr. Olmos also tries to narrow the scope of the holding in *Demore* based on Justice Kennedy's separate concurrence. The Court split 5-4 on the constitutionality of mandatory detention. Justice Kennedy, who was among the five justices in the majority, noted that due process concerns could arise if deportation proceedings took too long or continued detention became "unreasonable or unjustified." *Demore v. Kim*, 538 U.S. 510, 532 (2003) (Kennedy, J., concurring). But, Justice Kennedy did not suggest that a short gap in custody could render detention unreasonable or unjustified. And, he ultimately joined the majority opinion, which upheld the constitutionality of mandatory detention even though the Ninth Circuit had acknowledged a one-day gap in custody.

In light of *Demore*, the canon of constitutional avoidance would not suggest congressional intent to excuse mandatory detention for a six-day gap in custody.[5]

### b.    Rule of Lenity

Mr. Olmos has not suggested that we apply lenity at step two. But, if we were to do so, we would be applying lenity only to decide whether the Board engaged in a permissible interpretation of § 1226. *See* p. 5, above. For this

---

[5]    Constitutional considerations could become greater when the gap in custody is considerably longer than six days.

21

purpose, lenity would provide little help. *See Oppedisano v. Holder*, 769 F.3d 147, 153 (2d Cir. 2014) (stating that the rule of lenity "does not trump *Chevron*'s requirement of deference to reasonable interpretations by administrative agencies of statutes for which they are responsible"); *Yi v. Fed. Bureau of Prisons*, 412 F.3d 526, 535 (4th Cir. 2005) ("Rather than apply a presumption of lenity to resolve the ambiguity, *Chevron* requires that we *defer* to the agency's reasonable construction of the statute."); *Perez-Olivo v. Chavez*, 394 F.3d 45, 53 (1st Cir. 2005) ("[T]he rule of lenity does not foreclose deference to an administrative agency's reasonable interpretation of a statute."); *see also Amador-Palomares v. Ashcroft*, 382 F.3d 864, 868 (8th Cir. 2004) (stating that the rule of lenity "does not supplant *Chevron* deference merely because a seemingly harsh outcome may result from the [Board of Immigration Appeals'] interpretation").

### 3.    Summary

The Board of Immigration Appeals provided a permissible interpretation of § 1226(c)(2), concluding that the reference to Paragraph "1" did not incorporate the phrase "when the alien is released." Deferring to this interpretation, we draw the same conclusion: In § 1226(c)(2), Congress limited the Attorney General's power to allow release of aliens identified in "A" through "D" even when there had been a six-day gap in custody. Thus, Mr. Olmos was not entitled to a bond

22

hearing and the district court erred when it declined to authorize mandatory detention.

### III. The Attorney General's Continued Duty to Impose Mandatory Detention

We also reverse for a second reason: Congress required the Attorney General to impose mandatory detention for aliens like Mr. Olmos who were convicted of certain crimes; even if the Attorney General failed to fulfill this requirement in a timely manner (as Mr. Olmos argues), the statutory requirement would not have disappeared. The requirement would have remained, and the Attorney General would eventually have had to detain Mr. Olmos under § 1226(c).

As noted above, § 1226(c)(1) states: "The Attorney General shall take into custody any alien who–[fits into Paragraphs "A" through "D"] when the alien is released . . . ." 8 U.S.C. § 1226(c)(1) (2012). The parties disagree on the meaning of "when the alien is released." According to Mr. Olmos, this phrase refers to the instant in which the alien is released from criminal confinement. For the sake of argument, we may assume that Mr. Olmos is correct. If he is, the Attorney General would have had a statutory duty to take custody of Mr. Olmos as soon as he was released on probation in his criminal case. The Attorney General did not do that. Instead, he waited six days to take Mr. Olmos into custody. The question is what happened to the Attorney General's statutory duty: Did it vanish?

23

The Supreme Court has repeatedly held that when a statute requires a governmental actor (like the Attorney General) to do something within a deadline and he fails to do it, the requirement continues. *E.g.*, *Barnhart v. Peabody Coal Co.*, 537 U.S. 149, 158-59 (2003); *Brock v. Pierce Cnty.* 476 U.S. 253, 260 (1986); *see also* p. 16 & note 1, above.

Mr. Olmos does not quarrel with this principle. Instead, he argues that a bond hearing would not strip the Attorney General of the ability to obtain detention, for he could still pursue detention through a bond hearing. This argument mischaracterizes the requirement imposed on the Attorney General in § 1226(c)(1): The Attorney General must detain aliens in Paragraphs "A" through "D" without a bond hearing. If an immigration judge orders release after a bond hearing, the Attorney General would no longer be carrying out the statutory requirement to take the alien into custody.

The Supreme Court addressed an analogous situation in *United States v. Montalvo-Murillo*, 495 U.S. 711 (1990). There the Bail Reform Act required the district court to conduct a detention hearing immediately upon the individual's initial appearance before a judge. *Montalvo-Murillo*, 495 U.S. at 714. The district court failed to timely conduct the detention hearing, ruling later that the government had lost its ability to order detention. *Id.* at 716.

24

Strict enforcement of the court's deadline would not have left the district court powerless. Without a detention hearing, the prosecutor could have sought "any conditions of release that [were] 'reasonably necessary to assure the appearance of the person as required and to assure the safety of any other person and the community.'" *Id.* at 727 (Stevens, J., dissenting) (quoting 18 U.S.C. § 3142(c)(1)(B)(xiv)). Nonetheless, the Supreme Court concluded that the district court had retained its duty to conduct a detention hearing even if the court had waited too long. *Id.* at 717-22.

The Supreme Court's rationale is equally applicable here. The duty here involves mandatory detention rather than the holding of a detention hearing (as in *Montalvo-Murillo*). The governmental actor here (the Attorney General) is similarly situated to the governmental actor in *Montalvo-Murillo* (the district court). There the governmental actor's delay did not vitiate the statutory duty, for the district court retained the duty to hold a detention hearing. Thus, the delay here by the governmental actor (the Attorney General) would not have vitiated his statutory duty to impose detention without a bond hearing even though the immigration judge might order detention after considering the options.

Mr. Olmos points out that even without mandatory detention, immigration judges might order detention. But, they might not. *See* 8 C.F.R. § 1236.1(d)(1) (2013). For example, here the immigration judge released Mr. Olmos on bond. By

25

doing so, the immigration judge prevented the Attorney General from doing what Congress required of him: to detain Mr. Olmos without a bond hearing.

According to Mr. Olmos, § 1226(c)(1) describes the aliens subject to mandatory detention. For the sake of argument, we may assume that Mr. Olmos is correct. But, even if he is, § 1226(c)(1) would constitute an unambiguous requirement imposed on the Attorney General. The section states: "The Attorney General shall take into custody any alien who—[falls under 'A' through 'D'] when the alien is released . . . ." 8 U.S.C. § 1226(c)(1) (2012). Regardless of whether the section serves a second purpose (describing the aliens subject to mandatory detention), it unambiguously required the Attorney General to take custody of Mr. Olmos once he was released in his criminal case.

The Attorney General waited too long to carry out that requirement. Thus, Mr. Olmos argues that the statutory requirement would have disappeared. But, Congress's statutory command did not vanish as a result of the Attorney General's delay. That command was for the Attorney General to detain aliens in certain categories (Paragraphs "A" through "D" of § 1226(c)(1)) without a bond hearing.

## IV. The Petitioner's Alternative Argument (the Necessity of Confinement in the Criminal Case)

Mr. Olmos argues in the alternative that § 1226(c) applies only to someone who has already been subject to incarceration as part of a criminal sentence. If

this interpretation is correct, Mr. Olmos would not be subject to § 1226(c) because he was sentenced to probation rather than criminal confinement.

Mr. Olmos forfeited this argument by failing to raise it in his habeas petition. We interpret the petition liberally because Mr. Olmos was pro se at the time. *See Garrett v. Selby Connor Maddux & Janer*, 425 F.3d 836, 840 (10th Cir. 2005). Even with a liberal construction, however, we cannot fairly interpret the habeas petition to include this claim.

In the habeas petition, Mr. Olmos included the phrase "from incarceration" in a single sentence:

> As more fully explained in the accompanying memorandum of law, the plain text, context, and structure of the statute make clear that the clause "when the alien is released" applies to aliens who are being released *from incarceration* on the underlying offense, not from any offense, and in close temporal proximity to the release for that underlying offense.

Appellant's App. at 13. But, Mr. Olmos never made any argument about the fact that he had not been incarcerated as part of his sentence. Instead, he argued that § 1226(c) did not apply because of the Attorney General's delay in invoking mandatory detention. *Id.* at 14.

Mr. Olmos also points to his oral argument in the district court. There Mr. Olmos began his argument: "I have been looking at this law, 8 U.S.C., but, you know, I haven't really spent time in jail, and I do have a possibility of staying in this country, because my wife is a U.S. citizen, my children are U.S. citizens."

27

Appellee's Supp. App. at 29. Through this comment, Mr. Olmos apparently was trying to tell the district court he had not been in serious trouble in his criminal cases. Whatever Mr. Olmos intended, however, his comment ("I haven't really spent time in jail") could not have alerted either the district court or the respondent to an argument that § 1226(c) applies only when an alien has been incarcerated as part of the sentence. Thus, neither the district court nor the respondent ever addressed the argument.

Because Mr. Olmos failed to present this argument in district court, it is forfeited. *See United States v. Burke*, 571 F.3d 1048, 1057 (10th Cir. 2009). If Mr. Olmos had urged plain error, we could consider it. *Id.* But, he has not. As a result, we decline to consider the argument. *See Richison v. Ernest Grp., Inc.*, 634 F.3d 1123, 1131 (10th Cir. 2011) ("[T]he failure to argue for plain error and its application . . . surely marks the end of the road for an argument for reversal not first presented to the district court.").

Mr. Olmos argues that we can entertain the argument because it is a central issue and important to the public interest. But, our discretion is limited. We can entertain new arguments only when they involve a matter of law and the proper resolution is certain. *Geddes v. United Staffing Alliance Emp. Med. Plan*, 469 F.3d 919, 931 (10th Cir. 2006).

For the sake of argument, we can assume that this issue involves solely a matter of law. But, the outcome is uncertain. The Board of Immigration Appeals has held in precedential decisions that "release" under § 1226(c) can refer to physical custody following arrest. *In re West*, 22 I. & N. Dec. 1405, 1410 (B.I.A. 2000); *In re Kotliar*, 24 I. & N. Dec. 124, 125 (B.I.A. 2007). Based in part on these administrative decisions, one federal appellate court has decided that release from an arrest had "fulfilled the release requirement" in § 1226(c). *Sylvain v. Attorney Gen.*, 714 F.3d 150, 161 (3d Cir. 2013). In light of the decisions by the Board and the federal appeals court, we cannot regard a contrary outcome as certain. In the absence of this certainty, we decline to address Mr. Olmos's interpretation of the term "release." We defer consideration of that issue to a future case, when the petitioner has preserved the issue in district court or urged plain error.

## V.    Conclusion

Mr. Olmos was not entitled to a bond hearing because (1) we must defer to the Board's interpretation of § 1226(c)(2) and (2) the Attorney General would have had to keep Mr. Olmos in detention even if there had been a gap in custody. For both reasons, we reverse and remand with instructions to deny the petition for review.