TORRUELLA, Circuit Judge
(Concurring).
I recognize that the Supreme Court has determined that Congress may, “[i]n the *44 exercise of its broad power over naturalization and immigration, ... regularly make[ ] rules that would be unacceptable if applied to citizens,” Mathews v. Diaz, 426 U.S. 67, 79-80, 96 S.Ct. 1883, 48 L.Ed.2d 478 (1976); see also Demore v. Kim, 538 U.S. 510, 521, 123 S.Ct. 1708, 155 L.Ed.2d 724 (2003), and that the right to bail is not absolute. United States v. Salerno, 481 U.S. 739, 754-55, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987). Yet, I must register my discomfort with respect to 8 U.S.C. § 1226(c).
I am compelled to suggest that the indefinite detention without access to bond or bail of any person in the United States violates due process. See Wong Wing v. United States, 163 U.S. 228, 238, 16 S.Ct. 977, 41 L.Ed. 140 (1896) (“[A]ll persons within the territory of the United States are entitled to the protection guarantied [sic] by th[e Fifth and Sixth] amendments [sic],...”); Yick Wo v. Hopkins, 118 U.S. 356, 369-70, 6 S.Ct. 1064, 30 L.Ed. 220 (1886) (applying Fourteenth Amendment due process and equal protection provisions “to all persons within the territorial jurisdiction, without regard to any differences of race, of color, or of nationality”). The U.S. Constitution specifically addresses the right to bail. It is the first concern of an amendment that names just three subject matters. “Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted.” U.S. Const, amend. VIII. As the Supreme Court has elsewhere noted, “[b]ail is basic to our system of law.” Herzog v. United States, 75 S.Ct. 349, 351, 99 L.Ed. 1299 (1955) (Douglas, Circuit Justice, 9th Cir.1955) (citing U.S. Const. amend. VIII; Stack v. Boyle, 342 U.S. 1, 72 S.Ct. 1, 96 L.Ed. 3 (1951)). The Fifth Amendment mandates that no “person ... be deprived of life, liberty, or property, without due process of law.” U.S. Const. amend. V.
When the government exercises its discretion to subject a person to detention without access to a bond hearing after the condition justifying detention has been in existence for a considerable period of time, it disregards what is by then self-evident— that said subject is neither a flight risk nor a danger to society, the primary reasons for denying bail. See 18 U.S.C. § 3142(e)(1); cf. Carlson v. Landon, 342 U.S. 524, 542, 72 S.Ct. 525, 96 L.Ed. 547 (1952) (“There is no denial of the due process of the Fifth Amendment under circumstances where there is reasonable apprehension of hurt from aliens charged with a philosophy of violence against this Government”). Although Judge Kayatta, Chief Judge Howard, and Judge Lynch view this issue differently, infra at 60-61, this Court has elsewhere described their views as counter-intuitive. . Saysana v. Gillen, 590 F.3d 7, 17-18 (1st Cir.2009) (“[I]t is counter-intuitive to say that aliens with potentially longstanding community ties are, as a class, poor bail risks----By any logic, it stands to reason that the more remote in time a conviction becomes and the more time after a conviction an individual spends in a community, the lower his bail risk is likely to be.”). Affirming the government’s prerogative to incarcerate persons in petitioners’ situation without bail or bond hearing is not only to allow arbitrary and abusive government action but to condone acts that run contrary to the Constitution. See Herzog, 75 S.Ct. at 351; see also Wong Wing, 163 U.S. at 237, 16 S.Ct. 977.
I write separately to ensure that the constitutional concerns raised by § 1226(c) and the government conduct it commands — the ongoing, institutionalized infringement of the right to bail and right to due process — are formally acknowledged. Notwithstanding these concerns, we reach the conclusion we must in light of Con *45 gress’s laws, legislative history, and the Supreme Court’s holdings. I thus concur in the judgment.
KAYATTA, Circuit Judge,
with whom HOWARD, Chief Judge, and LYNCH, Circuit Judge, join.
Congress enacted what is now 8 U.S.C. § 1226(c) because of its concern that immigration judges had proven to be insufficiently accurate predictors of which aliens would “engage in crime and fail to appear for their removal hearings.” Demore v. Kim, 538 U.S. 510, 513, 123 S.Ct. 1708, 155 L.Ed.2d 724 (2003); see S.Rep. No. 104-48, at 2 (1995) (“Despite previous efforts in Congress to require detention of criminal aliens while deportation hearings are pending, many who should be detained are released on bond.”). To address this concern, Congress identified four categories of what Congress called “criminal aliens.” 8 U.S.C. § 1226(c). Section 1226(c), as signed by the President on September 30, 1996, as part of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (“IIRIRA”), mandates, first, that thé Attorney General “take into custody” these criminal aliens “when the alien is released” from criminal detention (the “custody mandate”). See id. § 1226(c)(1). Section 1226(c) then mandates, second, an end to the practice of immigration judges trying to predict which of those criminal aliens will appear for removal proceedings if ordered to do so. See id. § 1226(c)(2). Under this latter mandate (the “no-release mandate”), the Attorney General must not release the criminal alien from the Attorney General’s custody pending resolution of the alien’s removal proceeding, unless release is necessary for protection of certain persons in connection with an investigation into a major crime. See id. The alien is, however, entitled to an immediate hearing to adjudicate any contention that the alien is not a criminal alien subject to section 1226(c)’s mandates. See 8 C.F.R. § 1003.19(h)(2)(ii).
With its evenly divided vote, our court leaves in place two district court decisions holding that, to the extent the Attorney General fails to comply promptly with the custody mandate, immigration judges will find themselves back in the position of predicting which criminal aliens will present themselves for removal if they are released on bail pending the conclusion of their removal proceedings. Indeed, as we understand the reasoning of our colleagues who would affirm the decisions below, any failure by the Attorney General to achieve prompt compliance with the custody mandate renders both the custody and the no-release mandates inapplicable. For the reasons we explain in this opinion, we would instead join all four other circuits that have considered this issue by sustaining the Board’s current practice in complying with section 1226(c). See Lora v. Shanahan, 804 F.3d 601, 611-14 (2d Cir.2015); Olmos v. Holder, 780 F.3d 1313, 1327 (10th Cir.2015); Sylvain v. Attorney General, 714 F.3d 150, 161 (3d Cir.2013); Hosh v. Lucero, 680 F.3d 375, 384 (4th Cir.2012).
I. Discussion
We begin by explaining our view that the statute’s mandates apply to petitioners, using the same tools of statutory construction that our colleagues employ to decide this case at step one of the Chevron analysis. See Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc., 467 U.S. 837, 842-43, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). We also explain why our colleagues’ parsing of section 1226(c), even if correct, fails to support the conclusion that the Attorney General’s failure to take a criminal .alien into custody immediately upon release somehow eliminates any further requirement to comply with Congress’s mandates *46 set forth in section 1226(c). Finally, although our colleagues do not reach Chevron step two, see id. at 843, 104 S.Ct. 2778, and therefore do not consider the constitutional avoidance argument that was relied upon in the vacated panel opinion, we do reach step two, and therefore briefly explain why that avoidance argument is not a valid basis for setting aside the Board of Immigration Appeals’ (“BIA”) reasonable interpretation of section 1226(c).
A. The Language and Structure of the Statute
8 U.S.C. § 1226(a) grants the Attorney General the discretion whether to take into custody aliens charged with removal and whether to continue that custody pending the completion of removal proceedings:
(a) Arrest, detention, and release
On a warrant issued by the Attorney General, an alien may be arrested and detained pending a decision on whether the alien is to be removed from the United States. Except as provided in subsection (c) of this section and pending such decision, the Attorney General—
(1) may continue to detain the arrested alien; and
(2) may release the alien on—
(A) bond of at least $1,500 ...; or
(B) conditional parole....
For certain aliens classified by Congress as “criminal aliens,” however, 8 U.S.C. § 1226(c) requires the Attorney General both to take the alien into custody and to maintain that custody without release subject to a narrow exception. Section 1226(c) states in full:
(c) Detention of criminal aliens
(1) Custody
The Attorney General shall take into custody any alien who—
(A) is inadmissible by reason of having committed any offense covered in section 1182(a)(2) of this title,
(B) is deportable by reason of having committed any offense covered in section 1227(a)(2)(A)(ii), (A)(iii), (B), (C), or (D) of this title,
(C) is deportable under section 1227(a)(2)(A)(i) of this title on the basis of an offense for which the alien has been sentence [sic] to a term of imprisonment of at least 1 year, or
(D) is inadmissible under section 1182(a)(3)(B) of this title or deporta-ble under section 1227(a)(4)(B) of this title,
when the alien is- released, without regard to whether the alien is released on parole, supervised release, or probation, and without regard to whether the alien may be arrested or imprisoned again for the same offense. (2) Release
The Attorney General may release an alien described in paragraph (1) only if the Attorney General decides pursuant to section 3521 of title 18 that release of the alien from custody is necessary to provide protection to a witness, a potential witness, a person cooperating with an investigation into major criminal activity, or an immediate family member or close associate of a witness, potential witness, or person cooperating with such an investigation, and the alien satisfies the Attorney General that the alien will not pose a danger to the safety of other persons or of property and is likely to appear for any scheduled proceeding. A decision relating to such release shall take place in accordance with a procedure that considers the severity of the offense committed by the alien.
*47 Each of the petitioners in this case, after arriving in this country, was convicted of one of the criminal acts listed in section 1226(c)(1)(A)-(D). See Castañeda v. Souza, 769 F.3d 32, 36 (1st Cir.2014), reh’g granted en banc. There is no dispute among the parties that section 1226(c) therefore plainly required the Attorney General: (1) to take petitioners into custody when they were released from incarceration, and (2) to detain them until the conclusion of their respective removal proceedings. The question under consideration is what happens when, as here, the Attorney General does not manage to detain the criminal alien until after the alien’s release from incarceration.
All members of our en banc panel appear to agree that the mandate of paragraph (2) of section 1226(c) strictly limiting the release of certain persons once detained applies to anyone who is “an alien described in paragraph (1).” So this case pivots, at least in the first instance, on determining the meaning of that phrase. The BIA, in a quite straightforward fashion, construed that phrase to mean any alien who satisfies one of the adjectival descriptions set forth in subparagraphs (A)-(D) of paragraph (1) (“any alien who” “is inadmissible” or “is deportable” under the specified laws). In re Rojas, 23 I. & N. Dec. 117, 121 (BIA 2001). Petitioners, and now three of our colleagues, argue instead — and this is crucial to their entire argument — that the pertinent description of the aliens in paragraph (1) clearly includes as well the adverbial phrase “when the alien is released” (emphasis added). In this manner, our colleagues reason that if an alien was not detained by the Attorney General immediately “when the alien [was] released,” then that alien is not an alien “described” in paragraph (1).
This attempt at deputizing an adverbial phrase into service as a description of the noun “alien” pays little heed to customary conventions of grammar and syntax. “An adverb, an adverbial phrase, or an adverbial clause may qualify several parts of speech, but a noun is not one of them.” Theodore M. Bernstein, The Careful Writer, A Modem Guide to English Usage 23 (1965). Conversely, adjectives (like those in subparagraphs (A)-(D)) are “good friends of the noun.” H.W. Fowler, A Dictionary of Modem English Usage 10 (Sir Ernest Gowers ed., 2d ed.1965); see also Merriam-Webster’s Collegiate Dictionary 19 (11th ed.2012). We do not mean to say that there are never circumstances in which writers might employ an adverbial phrase in the manner employed by our colleagues. ' Poetic license, after all, knows few bounds. Rather, we say merely that if a straightforward reading of the text employing basic, conventional usages of grammar points directly at a given interpretation, it should take some pretty heavy lifting to reject that interpretation, much less to reject it as not even within the zone of reasonableness.
Nor is grammar the only enemy of petitioners’ preferred reading of the text. Structure argues against petitioners as well. After stating what the Attorney General must do to “any alien who — ,” paragraph (1) sets down in four separately indented and lettered subsections the four clauses that plainly describe an alien, relegating the adverbial “when” phrase back to unlettered and unindented text. We thus not only have four adjectival clauses that obviously describe the noun “alien” and one adverbial phrase that less readily does so, but we also have a format that literally and visually sets the four descriptions apart from the adverbial phrase. This structure directly reinforces the reading of the “when” phrase as qualifying the verb “take” in the clause “[t]he Attorney General shall take into custody” rather than as describing “any alien[s].”
*48 In so observing, we do not mean to overstate the case. Our colleagues make a fair point that the statute might have been more clear had paragraph (2) referred only to subparagraphs (A)-(D). Of course, the fact that language might have been more clear — as it always could be— does not mean that it is not clear enough. See Caraco Pharm. Labs., Ltd. v. Novo Nordisk A/S, — U.S. -, 132 S.Ct. 1670, 1682, 182 L.Ed.2d 678 (2012) (“[T]he mere possibility of clearer phrasing cannot defeat the most natural reading of a statute. ...”); cf. In re Fahey, 779 F.3d 1, 6 (1st Cir.2015) (explaining that a statute’s meaning was clear even though the statutory language could not “be read as entirely excluding the possibility” that a competing — but ultimately unpersuasive— interpretation was correct). Relatedly, we note that Congress has on occasion, within the Immigration and Nationality Act (“INA”), referenced a general subparagraph while clearly intending to refer only to the inset subclauses within that subparagraph. See, e.g., 8 U.S.C. § 1153(b)(5)(B)(i) (referencing 8 U.S.C. § 1153(b)(5)(A) but clearly intending to cross-reference only the inset clauses (i)(iii) within (A)).
We also find it significant that the language and structure of section 1226(c) as a whole reveals that Congress actually did specify which criminal aliens described in paragraph (1) may be released notwithstanding those aliens’ prior commission of (A)-(D) crimes. It described those aliens in paragraph (2). And that description (of persons connected to government witnesses or investigations) plainly does not include petitioners. Cf. TRW Inc. v. Andrews, 534 U.S. 19, 28, 122 S.Ct. 441, 151 L.Ed.2d 339 (2001) (“Where Congress explicitly enumerates certain exceptions to a general prohibition, additional exceptions are not to be implied, in the absence of evidence of a contrary legislative intent.” (quoting Andrus v. Glover Constr. Co., 446 U.S. 608, 616-617, 100 S.Ct. 1905, 64 L.Ed.2d 548 (1980))).
We have good company in concluding that it is reasonable to read section 1226(c) in this manner. In describing the statute in the first sentence of Demore, the Supreme Court stated that section 1226(c) “provides that ‘[t]he Attorney General shall take into custody any alien who’ is removable from this country because he has been convicted of one of a specified set of crimes.” Demore, 538 U.S. at 513, 123 S.Ct. 1708. As petitioners would have it, the Court should have added “and has just been released” as part of its description of the alien to whom the mandates were intended to apply. But it did not, presumably because it was focused on its recognition that Congress’s goal was to end the practice of “releasing deportable criminal aliens on bond” in order to avoid what Congress decided was “an unacceptable rate of flight.” Id. at 520, 123 S.Ct. 1708. Of course, the Court’s description of the statute was not a holding. It certainly shows, though, that a pretty good reader of statutes easily reads the language as we do. Cf. S.D. Warren Co. v. Me. Bd. of Envtl. Prot., 547 U.S. 370, 377, 126 S.Ct. 1843, 164 L.Ed.2d 625 (2006) (looking to how the court previously tended to use the term “discharge” in dicta under the Clean Water Act).
In gauging the import of the foregoing textual analysis, we must also express a reservation concerning our colleagues’ interpretative methodology. At several steps in their analysis, they confront an interpretative guide that cuts against them (e.g., adverbs usually do not describe nouns, the layout of the subheadings supports a grammatical reading, the Supreme Court’s short-hand summary of the statute is informative). In each case, our colleagues correctly note that the guide is not *49 always dispositive. So far, so good. They then, however, proceed forward as if the import of those guides carries no continuing weight in the analysis and so does not undermine a conclusion that the statute is actually plainly to the contrary. We view that import, instead, as an accumulating weight capable of being offset only by evidence that speaks directly and unambiguously to the contrary. Silence, assumptions, inferences, and ambitiously constructed lines of reasoning that were likely never within the contemplation of any drafter serve poorly as substitutes for such evidence. See Rhode Island v. Narragansett Indian Tribe, 19 F.3d 685, 698 (1st Cir.1994) (“[Ljegislative history that is in itself inconclusive will rarely, if ever, overcome the words of a statute.”).
This is not to say that we end our own inquiry at this point. To the contrary, we accept the notion that most statutes must be read with a sense of what Congress was trying to do, and that such a sense may be derived from knowledge gained outside the four corners of the text, keeping in mind the weighty role that the text must continue to play. We also agree with our colleagues — and with the BIA— that the statutory language is not so plain as to foreclose all extra-textual inquiry. So, for that reason, and particularly because the actual language at issue touches upon matters of both personal liberty and the control of our nation’s borders, we think it reasonable to look next at the legislative history to determine whether one can say that the straightforward, grammatically conventional reading of the statute comports with a reasonable interpretation of what Congress was trying to accomplish.
B. Legislative History
Our review of the legislative history begins with the most directly pertinent legislative history: the conference report to the IIRIRA. Regarding section 1226(c) (i.e., section 236(c) of the law), the report states in full:
New section 236(c) provides that the Attorney General must detain an alien who is inadmissible under section 212(a)(2) or deportable under new section 237(a)(2). This requirement does not apply to an alien deportable under section 237(a)(2)(A)® on the basis of an offense for which the alien has not been sentenced to at least 1 year in prison. This detention mandate applies whenever such an alien is released from imprisonment, regardless of the circumstances of the release. This subsection also provides that such an alien may be released from the Attorney General’s custody only if the Attorney General decides in accordance with 18 U.S.C. 3521 that release is necessary to provide protection to a witness, potential witness, a person cooperating with an investigation into major criminal activity, or a family member or close associate of such a witness or cooperator, and such release will not pose a danger to the safety of other persons or of property, and the alien is likely to appear for any scheduled proceeding.
H.R.Rep. No. 104-828, 1996 WL 563320, at *210-11 (1996) (Conf. Rep.).
It is beyond dispute that the phrase “such an alien” as used in the third sentence of the conference report refers back to the aliens who are described in the first two sentences, neither of which contains (as either adjective or adverb) any requirement that the person be recently released. The third sentence simply tells us when the new custody mandate applies to “such an alien.” It is also entirely fair to presume that the same phrase “such an alien” means the same thing in the fourth sentence’s description of what the statute *50 “also” provides for: the no-release mandate. This is, of course, simply another way of saying that the alien “described” in section 1226(c)(2)’s no-release mandate is an alien described in 1226(c)(l)(A)-(D)— the same class of alien who is subject to the custody mandate whenever released. And since petitioners were admittedly subject to the custody mandate (i.e., each is “such an alien”) they are therefore subject to what section 1226(c)(2) also provides for such an alien: the no-release mandate.
We recognize that our colleagues manage to read even this directly authoritative legislative history as indicating that Congress intended to leave the no-release mandate contingent on how quickly the Attorney General complied with the detention mandate. While we have much difficulty seeing this, we need only for present purposes protest that such a reading is hardly compelling. It is our colleagues, not us, who must claim a monopoly on reasonableness.
We move next to the 1995 Senate Report that directly sets forth the substance of congressional concerns resulting in the enactment of the IIRIRA. S.Rep. No. 104-48 (1995). Treating the report as if it were Oz’s man behind the green curtain, our colleagues urge the reader to pay no attention to it. But the Supreme Court itself in Demore directly turned to this report for precisely the same purpose that guides us to look at the report: understanding the aims of Congress in enacting section 1226(c). See Demore, 538 U.S. at 518-21 & n. 4, 123 S.Ct. 1708. The Court&wkey; like us — has read this legislative history as plainly evidencing “Congress’ concern that, even with individualized screening, releasing deportable criminal aliens on bond would lead to an unacceptable rate of flight.” Id. at 520, 123 S.Ct. 1708. For example, the Senate Report emphasized that “[ujndetained criminal aliens with deportation orders often abscond upon receiving [a notice of removal].... (This notice is humorously referred [to] by some INS personnel as the 72 hours ‘run notice.’)” S.Rep. No. 104-48, at 2-3; see Demore, 538 U.S. at 518-19 & n. 4, 521, 123 S.Ct. 1708. The data before Congress likewise supported its concern that immigration judges fared poorly in trying to predict which aliens would take flight once INS took steps to remove them. S.Rep. No. 104-48, at 2 (“Over 20 percent of nondetained criminal aliens fail to appear for deportation proceedings.”). And the Senate Report’s recommendation that “Congress should consider requiring that all aggravated felons be detained pending deportation” due to “the high rate of no-shows for those criminal aliens released on bond,” S.Rep. No. 104-48, at 32 (emphasis added), directly addressed — and is certainly entirely consistent with — this concern.
Nor did Congress give any reason to think that this concern disappeared merely because the criminal alien was not detained for a period of time before deportation proceedings began. To the contrary, the “deportable criminal aliens [who] failed to appear for their removal hearings,” Demore, 538 U.S. at 519, 123 S.Ct. 1708, were all those aliens who were not being held in INS custody. In this respect, it is helpful to keep in mind the actual interpretation of the statute that petitioners urge. They repeatedly argue that Congress would not have been concerned about allowing immigration judges to predict flight risk for criminal aliens who have “long since returned to their communities.” But their reading of the statute would mean that all criminal aliens who avoid detention “when ... released” would be entitled to a shot at convincing an immigration judge that the alien would voluntarily surrender if removal is ordered. And this would be so whether the alien has been free from prior criminal custody for a week or for five *51 years, and no matter what the alien has done post-release.
Of course, one could argue that the immigration judges will not release obvious flight risks. But that is presumably what immigration judges were trying to do before Congress concluded that it had insufficient confidence in the immigration judges’ ability to make ad hoc predictions, and opted for the categorical treatment of four groups of aliens who are most likely to be removed. To now say that the executive, merely by failing to detain a criminal alien promptly, can revive the immigration judges’ ability to pick and choose who gets released on bail would be a result directly at odds with what Congress plainly sought to achieve. Cf. King v. Burwell, — U.S. -, 135 S.Ct. 2480, 2496, 192 L.Ed.2d 483 (2015) (rejecting an interpretation of the Affordable Care Act that would lead to the “result that Congress plainly meant to avoid”).
Nor does it help petitioners to argue that Congress’s concern about recidivism is somehow inapplicable categorically for those criminal aliens who have “lived in the community” for some undefined period of time post-release. In the first place, there is no compelling evidence in the record that Congress meant section 1226(c) to apply only when both reasons for its enactment — avoiding flight and re-offense— would be served. Second, just as Congress found unacceptable the mere possibility of recidivism among this category of criminal aliens during the period between release from criminal custody and removal adjudication, there is no basis in the record for presuming that Congress felt that immigration judges would be in a position to discount that possibility merely by noting that the criminal alien had been released some time ago. The immigration judges will both lack much knowledge about what the criminal alien has been doing since release and have no ability to predict future behavior that is materially greater than the ability found by Congress to be insufficient.
The legislative record, like Conan Doyle’s dog that did not bark, also conveys much by what it does not say. See Chisom v. Roemer, 501 U.S. 380, 396 & n. 23, 111 S.Ct. 2354, 115 L.Ed.2d 348 (1991). Imagine, for example, that petitioners were correct: if a criminal alien were not detained immediately upon release from prison, that alien would have a right to convince an immigration judge that the alien is not a flight risk. And, as our colleagues read the statute, this right would belong to every alien not detained upon release, whether or not the alien settled in any community, or took efforts to hide, or even went on a crime spree. If that had been Congress’s aim, it is unlikely that there would be no acknowledgement of such a loophole, nor any language in the statute defining and limiting the loophole.
Similarly, if the entire mandatory detention regime hinged on whether the criminal alien was detained “when ... released,” one would have expected Congress to pay some attention to defining that term. How much time is too much? What if the alien hides? What if the alien commits a new crime? What if the state prison does not cooperate, making it impossible for federal agents to know when the alien will leave state custody? There is no evidence that Congress viewed its legislation as raising such questions, all of which would have been nose-on-the-face obvious had Congress intended the statute to be read as petitioners would have us read it. Precisely to the contrary, the entire focus was broadly and categorically on “[ujndetained criminal aliens.” See S.Rep. No. 104-48, at 2.
Particularly noteworthy in this regard is the fact that the drafters were well aware *52 of — and concerned about — the fact that criminal aliens were avoiding detention because some state and local authorities refused to let INS know when criminal aliens were being released. See S.Rep. No. 104-48, at 16-17, 22. Yet, if petitioners are correct, Congress gave the state and local authorities hostile to Congress’s aim complete ability to frustrate pursuit of that aim.
Our knowledge of how Congress chooses to affect the removal process of criminal aliens in other provisions of the U.S. Code dovetails with our understanding of Congress’s purpose in enacting section 1226(c). For example, Congress, in the IIRIRA, barred from eligibility for cancellation of removal any permanent resident alien convicted of an aggravated felony.[42] See Pub.L. No’. 104-208, 110 Stat. 3009-594 (creating 8 U.S.C. § 1229b(a)(3)); Rojas, 23 I. & N. Dec. at 121-22. Congress also stripped courts of jurisdiction “to review any final order of removal against an alien who is removable by reason of having committed” certain criminal offenses that are also listed as predicate offenses under section 1226(c)(l)(A)-(C). See 8 U.S.C. § 1252(a)(2)(C); Rojas, 23 I & N Dec. at 122.[43] The aliens described in (A)-(D) are therefore more likely to lose — and more likely to expect to lose — in a removal proceeding, thus increasing the incentive to flee once they are on Immigration and Customs Enforcement’s (“ICE”) radar. It therefore seems natural to conclude that Congress wanted these aliens to be in custody when the removal proceeding concluded, whether or not they were taken into custody right when previously released.
Congress’s focus in related legislation on making it more difficult for criminal aliens to successfully contest a removal order also reinforces the view that Congress aimed to deal with such aliens categorically. In saddling criminal aliens with many burdens not imposed on aliéns who reside in the United States without committing crimes viewed by Congress as especially relevant to immigration status, see swpra note 43, Congress has drawn no distinction based on when the alien is detained. Evidence of living in the community for years post-release does not eliminate the legal disabilities in removal proceedings imposed by the prior commission of certain criminal acts. On the contrary, during the years preceding the IIRIRA and within the IIRIRA itself, Congress actively sought to narrow the group of criminal aliens eligible for relief based on duration of residency. For example, prior to the IIRIRA, many aliens with “a lawful unrelinquished domicile of seven consecutive years” could seek relief from removal despite their prior criminal activity. See INS v. St. Cyr, 533 U.S. 289, 295, 121 S.Ct. 2271, 150 L.Ed.2d 347 (2001) (quoting sec *53 tion 212(c) of the INA, formerly codified as 8 U.S.C. § 1182(c)). This sort of relief had “great practical importance,” id., and “the class of aliens whose continued residence in this country ... depended on their eligibility for § 212(c) relief [was] extremely large, and not surprisingly, a substantial percentage of their applications” were granted, id. at 295-96, 121 S.Ct. 2271. After amendments to the INA in 1990 and 1996 narrowed the availability of section 212(c) relief, the IIRIRA eliminated it and replaced it with an even narrower class of lawfully admitted permanent resident aliens who had been lawfully present for at least five years and had not been convicted of an aggravated felony. See id. at 297, 121 S.Ct. 2271; 8 U.S.C. § 1229b(a).
We have also considered the language governing section 1226(c)’s effective date, IIRIRA, § 303(b)(2), 110 Stat. 3009, 3009-586, and the IIRIRA’s Transition Period Custody Rules (“TPCR”), IIRIRA, § 303(b)(3), 110 Stat. at 3009-586 to -5S7.[44] We agree with our colleagues that such language, as part of the very statute at issue, provides a source of potential insight into the meaning of its companion terms. See Gutierrez v. Ada, 528 U.S. 250, 255, 120 S.Ct. 740, 145 L.Ed.2d 747 (2000). That insight runs in favor of the interpretation we adopt.
Most notably, the effective date provision states that section 1226(c) “shall apply to individuals released after” the expiration of the TPCR. IIRIRA, § 303(b)(2), 110 Stat. at 3009586. That clause would be superfluous if petitioners were correct that the detention-without-release mandate applies only to aliens who are picked up right away, because immediate detention would be impossible for aliens who had already been released prior to the TPCR’s expiration date. See Nat’l Ass’n of Home Builders v. Defs. of Wildlife, 551 U.S. 644, 669, 127 S.Ct. 2518, 168 L.Ed.2d 467 (2007) (“[W]e have cautioned against reading a text in a way that makes part of it redundant.”). While we acknowledge the Supreme Court’s recent reiteration that its “preference for avoiding surplusage constructions is not absolute,” King, 135 S.Ct. at 2492 (internal quotation mark omitted), the canon provides at the very least yet another thumb to be added to grammar, structure, and legislative purpose on the scale in favor of our interpretation.[45]
That thumb is particularly large in this case, where (unlike in King), Chevron applies. See King, 135 S.Ct. at 2488-89 (declining to apply the Chevron two-step framework because if “Congress wished to assign [interpretation] to an agency, it surely would have done so expressly”). Here, we are first asked whether Congress has spoken clearly and directly to the question at issue, and second whether the BIA’s interpretation is a reasonable one. The surplusage caused by petitioners’ interpretation at once makes the interpretative path they walk less direct and the BIA’s reading in Rojas more reasonable. Cf. Nat’l Credit Union Admin. v. First Nat’l Bank & Tr. Co., 522 U.S. 479, 501, 118 S.Ct. 927, 140 L.Ed.2d 1 (1998) (reject *54 ing, under Chevron step one, agency’s interpretation in part because it made “the phrase ‘common bond’ surplusage”).
Even putting to one side the surplusage ramification, the TPCR provides no support for petitioners’ position because it simply raises the same interpretative question that section 1226(c) poses: do the custody and no-release mandates during the transition period apply if there is a delay in detaining the alien? Our colleagues nevertheless attempt to glean from the TPCR two points of support that warrant our consideration.
First, they point out that the transition rules set forth in the TPCR contain language stating that, should the Attorney General as anticipated invoke the transition rules, § 1226(c) will apply only to persons released after expiration of the transition period. The rules contain no similar provision stating that the mandates in the transition rules themselves apply only to aliens released after the transition rules become effective. This means, our colleagues reason, that under our interpretation the breadth of the mandate’s duty imposed on the Attorney General under the permanent rules of section 1226(c) would be “less sweeping than the supposedly more flexible TPCR mandate’s bar had been” even though the TPCR was intended to accommodate the Attorney General’s need to ramp up resources. The way to fix this “anomalous” result, our colleagues argue, is to read the TPCR’s bar on releasing aliens to apply only to those taken into custody “when ... released.” And if one reads the TPCR that way, by analogy one should read section 1226(c) that way. Anomaly cured.
In this manner, our colleagues imagine a problem that does not exist in order to advocate a solution that is not required. There is no need to interpret the TPCR in this manner to make its duties “less sweeping” than those imposed by section 1226(c). The TPCR, unlike section 1226(c), expressly allows the Attorney General to release any detained aliens who fall into two of the four groups of aliens described in both the TPCR and section 1226(c). Our colleagues offer no evidence at all establishing that the effect of this categorical exclusion does not swamp whatever burden might arise as a result of the theoretical possibility that the Attorney General within the brief two-year transition period might pick up criminal aliens who had not been released from criminal custody during that period.
More fundamentally, our colleagues’ premise that language in the TPCR need be rendered superfluous in order to cure a perceived “anomaly” between the TPCR and section 1226(c) incorrectly presumes that it was possible to start up a new regime, with differing transition rules, and not have some “anomalies.” For example, what was to be done with an alien who was released from prison during the transition period, and who then moved for bail after, the expiration of the transition period? Under the language of the transition rules — and under either interpretation of section 1226(c) proffered in this case — such a person would suddenly have a shot at bonded release that he might not have had if he had moved for bail before the transition period had expired (i.e., the section 1226(c) detention mandates would be “less sweeping”). See In re Adeniji, 22 I. & N. Dec. 1102, 1110-11 (BIA 1999). Certainly such an anomaly provides no license to rewrite section 1226(c). It does, however, make clear that some such anomalies arise inevitably from the need to have some arbitrary cut-offs for implementing new programs.
Second, our colleagues complain that, in some instances, the BIA’s reading of section 1226(c) would have “de-linked” or “misaligned” the custody and no-release *55 aspects of section 1226 if the TPCR transition rules had not been invoked because the clause in the TPCR limiting section 1226(c) as a whole to persons released after the TPCR became effective would not have been triggered. As an example, our colleagues point to a suspected terrorist described in subsection 1226(c)(1)(D) who has never been imprisoned and who is roaming the streets. Under the BIA’s interpretation, the Attorney General would reserve the ability to decide whether to arrest such a person because the custody mandate would not have been triggered by a prior release. Once the Attorney General decided the suspected terrorist should be detained, under the BIA’s reading of section 1226(c)(2), as it would apply had the transition period not been implemented, no immigration judge would have the discretion to release the alien unless the alien prevailed in the removal proceeding. Our colleagues apparently think this is an obviously unsound result, and that Congress must have intended that immigration judges could second guess the Attorney General and order such an alien released. How one reads Congress’s manifest unhappiness with the predictive failure of immigration judges as supporting such a conclusion puzzles us.[46]
Our colleagues also lean hard on the meaning they derive from section 1226(c)’s predecessors. We agree with the BIA’s position in Rojas that, while none of the other predecessor provisions shed helpful light on the issue to be decided in this case, the post-1991, pre-AEDPA version of the custody and no-release mandates is instructive. Rojas, 23 I & N. Dec. at 123-24. That version, embodied in section 242(a)(2) of the INA following the 1990 and 1991 amendments,[47] provided that:
(A) The Attorney General shall take into custody any alien convicted of an aggravated felony upon release of the alien (regardless of whether or not such release is on parole, supervised release, or probation, and regardless of the possibility of rearrest or further confinement in respect of the same offense). Notwithstanding [the equivalent of section 1226(a) ] ... but subject to subpara-graph (B), the Attorney General shall not release such felon from custody.
(B) The Attorney General may not release from custody any lawfully admitted alien who has been convicted of an aggravated felony, either before or after a determination of deportability, unless the alien demonstrates to the satisfaction of the Attorney General that such alien is not a threat to the community and that the alien is likely to appear before any scheduled hearings.
INA § 242(a)(2) (1991) (emphasis added).
Under subparagraph (B) (the equivalent of section 1226(c)(2)), whether the alien is *56 subject to that statute’s mandate limiting release prior to his hearing turns entirely on whether the alien was convicted of an aggravated felony, “unless” the alien is able to demonstrate that he is not a bond risk. There is nothing in that version of the statute that even remotely suggests that a lapse in establishing custody removes an alien from the scope of subpara-graph (B)’s coverage. And notably absent from subparagraph (B) is any mention of subparagraph (A) or its “upon release” language (i.e., the “when ... released” clause’s equivalent). This is a problem for our colleagues and petitioners because, once again, that textual reference point is the only hook they latch on to in concluding that the description of aliens subject to the no-release mandate includes a timing element. Simply put, the language of the most long-standing version of the no-release mandate prior to the IIRIRA does not appear to contain any of the ambiguity that section 1226(c) arguably possesses with respect to the relevance of the timing of release. None of the language in the predecessor provisions to which our colleagues point contains this level of clarity on this key point. And if our colleagues’ position that Congress has never sought to alter the relationship between the custody and no-release mandates is correct, this would seem to doom their argument.
Our colleagues point, instead, only to an off-point BIA opinion, Matter of Eden, 20 I. & N. Dec. 209 (BIA 1990), as reflecting the pre-IIRIRA law that Congress sought to preserve. But the question of whether a delay in detaining a criminal alien eliminated the Attorney General’s obligation to deny bond once the alien was detained was not even raised as an issue in Eden. Rather, the case involved an alien who had been taken into immigration custody while on “special parole” as part of his criminal sentence. The question posed was whether subjecting such a person to mandatory immigration custody without bond was inconsistent with “Congress’ decision to allow [an] alien serving time in [a] state or local facility to finish out that time before the Service assumes responsibility for his incarceration.” Id. at 214.
It is true that, under Rojas’s reasoning, the BIA perhaps could have reached the same result in Eden merely by saying that once a criminal alien was detained, he could not be granted bond regardless of whether he had yet been released from prior custody. Even under that approach, though, the BIA would have had an interest in clarifying the scope of the Attorney General’s statutorily mandated duty to detain a criminal alien — and, namely, in clarifying whether conceiving of a duty on the Attorney General to detain a person too soon (i.e., during the course of a prior sentence) ran up against the congressional intent expressed through the 1988 legislation’s “upon release” provision. In any event, the simpler point is that there is no holding in Eden, either express or implied, that addresses the issue posed here.[48]
Compounding their attempt to glean a holding — much less settled law — from Eden, our colleagues then simply misread the House report to the 1990 legislation that revised the clause “upon completion of the alien’s criminal sentence” to read “upon release of the alien (regardless of whether or not release is on parole, supervised release, or probation ....).” Rightly or wrongly, the report plainly states that Congress was concerned that “[a]t least one immigration judge has ruled that an aggravated felon who has been paroled by the sentencing court continues to serve his ‘sentence’ [and therefore] INS has no authority to incarcerate this alien until *57 his period of parole has ended.” H.R.Rep. No. 101-681, pt. 1, at 148 (1990), as reprinted in 1990 U.S.C.C.A.N. 6472, 6554 (emphasis added). In short, Congress was fearful that its mandate to take criminal aliens into custody without bond upon completion of the sentence was being construed as divesting INS of any authority to detain an alien while the alien was on parole. Restoring that authority implied a “link” to the no-release mandate only in the obvious sense that any elimination of INS’s authority even to take a person into custody obviously frustrates any mandate that the person be kept in custody. Nothing in this sort of logical link in any way implies (much less compels) a conclusion that the custody and the no-release mandates are “linked” in the sense that our colleagues’ analysis requires. To the contrary, the fact that Congress wanted even those criminal aliens who would otherwise be subject to parole reporting and supervision to be detained during their removal proceedings would seem to cut against our colleagues’ assumption that a brief period of unsupervised living in the community eliminated the need for detention.
This type of error (presuming that any reference to “immediate” detention without bond implies that a delay in detention makes a bond possible) pervades our colleagues’ entire discussion of the legislative record. When we see Congress repeatedly emphasizing that the government must take criminal aliens into custody “when,” “upon,” or “immediately upon” their release, and then not release them, we see no implied loophole. Rather, we see an increasingly urgent expectation that criminal aliens should be found in custody when the removal decision issues.
We stress, too, that even if one were to ignore these defects in our colleagues’ survey of the legislative history, the most one ends up with are efforts to infer an answer to the question at hand from statements made in addressing other issues where the resolution of those other issues did not require or even call upon a degree of precision that would be necessary to confirm the force of the inference. And in each instance, the actual resolution of the issue at hand is completely compatible with the BIA’s conclusion in Rojas. Inferences of this type, whether reasonable or not, seem to us to fall far short of the “clear” legislative record one should require to end the inquiry at Chevron step one.
Turning their focus from the 1991 amendment and its predecessors, our colleagues repeat their error in claiming that we should presume that, in enacting the IIRIRA, Congress was aware of the fact that “district courts ... treated the retained ‘upon release’ clause [of AEDPA] as if it conditioned the retained ‘such felon clause.’ ” Supra at 33. Our colleagues cite five district court cases as constituting this “existing law” of which Congress was supposedly aware. Three are actually holdings that address retroactivity under AEDPA. Montero v. Cobb, 937 F.Supp. 88 (D.Mass.1996); Villagomez v. Smith, No. C96-1141C, 1996 WL 622451 (W.D.Wa. July 31, 1996) (unpublished); DeMelo v. Cobb, 936 F.Supp. 30 (D.Mass.1996), vacated, 108 F.3d 328 (1st Cir.1997) (per cu-riam). As for the fourth, we sincerely doubt that Congress managed to dredge up an obscure unpublished opinion from the Southern District of Texas, which to this day remains difficult to locate. See In re Reyes, Case No. B-94-80 (S.D.Tex. May 31, 1996). The fifth, Grodzki v. Reno, 950 F.Supp. 339 (N.D.Ga.1996), is arguably on point, but'was not issued until September 20, 1996, just ten days before the already drafted IIRIRA was passed into law. See Pub.L. No. 104-208, 110 Stat. 3009. In any event, even were all five cases squarely apposite, five district court opinions *58 could not establish the type of “settled judicial construction” as to which we presume congressional awareness. See United States v. Powell, 379 U.S. 48, 55 n. 13, 85 S.Ct. 248, 13 L.Ed.2d 112 (1964) (four lower court opinions, including two by circuit courts, insufficient).
In sum, against a legislative backdrop thick with indications that Congress aimed to ensure that criminal aliens not go free prior to the conclusion of their removal proceedings, our colleagues stake their reading of the statute on one off-point BIA ruling, one district court decision issued ten days prior to the IIRIRA’s enactment, and the supposedly anomalous results derived from reading section 1226(c) in conjunction with what our colleagues themselves describe as “an ancillary and potentially never operative clause in the TPCR,” supra at 30 n. 23. In view of the foregoing, one might argue that section 1226(c)’s legislative history actually compels a finding that the straightforward, grammatically conventional reading of the statute must be correct. Instead, tempering our confidence in our own interpretative analysis, we need opine at this point only that the legislative history is not so clearly to the contrary as to compel a finding that “Congress has directly spoken to the precise question at issue” (much less that it spoke with the intent our colleagues claim is clearly apparent). Chevron, 467 U.S. at 842, 104 S.Ct. 2778.
C. Our Colleagues’ Conclusion Falls Short of the Mark
We have explained our disagreement with our colleagues’ argument that no reasonable jurist can read the phrase “as described in paragraph 1” as not incorporating into paragraph 2 the phrase “when released.... ” Even if we are wrong, though, we agree with the Second, Third, Fourth, and Tenth Circuits that the Attorney General’s delay in detaining petitioners does not render the no-release mandate inapplicable. Our sister circuits have explained why this is so under the loss-of-authority rubric. See Lora, 804 F.3d at 611-12; Olmos, 780 F.3d at 1324-26; Sylvain, 714 F.3d at 157-61; Hosh, 680 F.3d at 381-83. We prefer to reframe the point as a matter of interpreting the text consistently with the purpose manifest in the text. The key point here is that even if the no-release mandate of paragraph (c)(2) applied by its terms only to persons who have been released from criminal custody, there is no good reason to say also that it applies only when the Attorney General complies with the custody mandate by detaining the criminal aliens right when they are released.
Consider the following example that we have crafted so that its substance and evident purpose invite the type of reading that our colleagues insist is applicable to section 1226(c).
(1) Please give an especially thorough watering to any plant that is:
(A) a sunflower, or
(B) a hibiscus
when it is planted for the garden show.
(2) Do not let a plant described in paragraph (1) go any day without water unless you are certain that it is dead.
Under the scenario posed by this example, we would agree that it is reasonable to read the reference to plants “described in paragraph (1)” as indicating not all sunflower or hibiscus plants, but rather as indicating sunflower or hibiscus plants that are newly planted for the garden show. This is because our knowledge that certain new plantings need prompt and regular watering gives us a clue for resolving any *59 ambiguity created by the structure and awkward syntax of the mandates.
Nevertheless, even in this example designed to welcome the type of reading that our colleagues give to section 1226(c), it simply does not follow that the mandate of section (2) is also contingent upon prompt compliance with the mandate of section (1). No reasonable person would let the plants in question continue to go without water merely because impediment or neglect unduly postponed the first watering.
Of course, this conclusion, too, follows in great part from an assumption that the principal purpose of the mandates is to keep the new plants alive. In the case of section 1226(c), an analogous (and actual) purpose is manifest in the legislative history discussed in this opinion and in Demore. In repeatedly and even more broadly expressing dissatisfaction with criminal aliens not being in custody when removal is ordered, Congress did not order the Attorney General to detain such aliens only if she chose to do so right away. Rather, we read section 1226(c) as ordering the Attorney General to detain such persons, and to do it right away. The question whether the Attorney General complied with that mandate right away— like the question whether the plants were watered promptly when planted — is simply an exogenous and independent fact that is not part of the description of those to whom either mandate applies.[49]
D. The Constitutional Avoidance Canon
Since our colleagues rest their decision on Chevron’s first step, they do not reach the constitutional avoidance argument principally relied upon by petitioners and by the panel opinion we vacated prior to hearing this appeal en banc. See Warger v. Shauers, — U.S. -, 135 S.Ct. 521, 529, 190 L.Ed.2d 422 (2014) (constitutional avoidance canon “has no application in the absence of ... ambiguity” (omission in original) (internal quotation marks omitted)); Olmos, 780 F.3d at 1321 (citing Warger in declining to consider the canon for purposes of Chevron step one). Because we disagree with our colleagues’ conclusion that no reasonable person can read the statute other than as they read it, we explain why the constitutional avoidance canon, even if it may be appropriately applied at Chevron step two,[50] does not *60 remove the BIA’s decision in Rojas from the range of permissible interpretations requiring deference.[51]
Petitioners’ basic claim in favor of applying the canon is that a statutory command to detain aliens such as petitioners who had peacefully resided in the community for years after their release from criminal custody would raise serious constitutional due process concerns. In accepting this claim, the panel opinion relied on what seems to us to be a doubly flawed reading of Justice Kennedy’s concurring opinion in Demore.
First, the panel viewed Justice Kennedy’s concurrence as limiting the Demore majority’s rationale for upholding section .1226(c). See Castañeda, 769 F.3d at 39 & n. 4. The panel appeared to be (erroneously) applying the Supreme Court’s Marks principle, which instructs that “[w]hen a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds.” Marks v. United States, 430 U.S. 188, 193, 97 S.Ct. 990, 51 L.Ed.2d 260 (1977) (internal quotation marks omitted). But Justice Kennedy’s concurrence in Demore explicitly stated that he joined the majority’s “careful opinion ... in full,” Demore, 538 U.S. at 533, 123 S.Ct. 1708 (Kennedy, J., concurring), so nothing therein limits the majority’s rationale for upholding section 1226(c).
Nor does Justice Kennedy’s concurrence provide persuasive authority in favor of petitioners’ due process argument. That concurrence expressed no reservation at all, constitutional or otherwise, about the amount of time that passed between the moment an alien became released and the moment of the alien’s detention. Rather, Justice Kennedy wrote separately to address a concern (which we share) about the amount of time an alien spends in immigration detention while he waits for his removal proceeding. See id. at 532, 123 S.Ct. 1708 (“[SJince the Due Process Clause prohibits arbitrary deprivations of liberty, a lawful permanent resident alien such as respondent could be entitled to an individualized determination as to his risk of flight and dangerousness if the continued detention became unreasonable or unjustified.” (emphasis added)). The concurrence’s three citations to Zadvydas v. Davis, 533 U.S. 678, 121 S.Ct. 2491, 150 L.Ed.2d 653 (2001), a case dealing with the constitutional limits upon the duration of post-removal-period detention (and the only court case cited by the concurrence), support that limited reading.
To be sure, the Demore majority addressed only the general application of section 1226(c) to an alien who had committed an (A)-(D) offense, without considering the precise constitutional consideration — the length of time an- alien managed to avoid detention post-release — that petitioners now claim requires a resolution in their favor.[52] But for the following reasons, we view this as a distinction without a differ *61 ence with respect to whether the delay in commencing detention experienced by petitioners raises constitutional concerns.
Petitioners’ argument rests on the premise that, once a law-breaking alien has been out of custody for several years, one can no longer regard him as presenting a sufficiently heightened risk of danger or flight, even once the alien finds out ICE now wants to deport him on grounds that will be hard to successfully contest. Neither petitioners nor the vacated panel opinion cite any controlling authority for this proposition, and we have great difficulty accepting this view of flight risk as a matter of common sense. See Olmos, 780 F.3d at 1323 (“[W]e do not abandon Chevron deference at the mere mention of a possible constitutional problem.” (alteration in original) (quoting Kempthorne, 512 F.3d at 711)). It seems to us that Congress could have — and did — reasonably regard this group of aliens as categorically posing a flight risk because their commission of the designated crimes makes it highly likely that they will be deported if ICE comes knocking. Hence, there is little to lose by trying to hide, especially once a removal order issues. See S.Rep. No. 104-48, at 2-3 (“Undetained criminal aliens with deportation orders often abscond upon receiving a final notification [of removal] .... Too often, as one frustrated INS official told the Subcommittee staff, only the stupid and honest get deported.”). The incentive to flee peaks once the criminal alien knows that ICE has decided to come after him. And while the incentive may be depressed while ICE ignores the alien, once ICE manifests an intention to proceed forthwith, the incentive to flee before the deportation proceeding ends would seem to be unrelated to any delay in making that manifestation.[53]
The view of petitioners and of the vacated panel opinion on this point is effectively that, if there is an individual fact showing a person poses a lesser risk of flight or danger (e.g., has been living in a community for years), then that person is constitutionally entitled to a bail hearing. See Castañeda, 769 F.3d at 47-48 (“Mandatory detention of individuals such as the petitioners appears arbitrary on its face.”). This view fundamentally pushes back on Congress’s ability (affirmed in Demore) to say categorically that criminal aliens should not have the ability to flee while awaiting the reásonably prompt conclusion of their deportation hearings.[54] We would therefore reject it.
We note, finally, that petitioners have raised no argument based on the duration of their detention, nor have they produced evidence that the BIA’s interpretation of section 1226(c) will subject them to systemic delays or otherwise prolong the length of their detention prior to a hearing. Cf. Demore, 538 U.S. at 532, 123 S.Ct. 1708 (Kennedy, J., concurring). As *62 of the time that the Supreme Court last considered the statute, “in 85% of the cases in which aliens [were] detained pursuant to § 1226(c), removal proceedings [were] completed in an average time of 47 days and a median of 30 days.” Demore, 538 U.S. at 529, 123 S.Ct. 1708. To the extent that the Attorney General would attempt to use section 1226(c) to detain persons for materially more extended durations, see Lora, 804 F.3d at 615-17, we offer in this opinion no blessing of such detentions. Rather, we opine only that the constitutional arguments raised by petitioners here do not make impermissible the BIA’s interpretation of section 1226(c), either facially or as applied to petitioners.
II. Conclusion
For the foregoing reasons, we would hold that petitioners have the characteristics of “an alien described in” section 1226(c)(1), and that the Attorney General is correct in concluding that she therefore lacks the discretion to grant them a bond. hearing.[55]

. An alien who is "deportable by reason of having committed” an aggravated felony falls under section 1226(c)(1)(B). Compare 8 U.S.C. § 1226(c)(1)(B), with id. § 1227(a)(2)(A)(iii).

. The INA contains numerous other examples of ways in which Congress has made it more difficult for criminal aliens to avoid removal. For instance, in removal proceedings, lawful permanent residents convicted of crimes involving moral turpitude may not qualify for a discretionary waiver of remova-bility, because commission of a crime of moral turpitude tolls the accrual of the seven years of residence required for cancellation of removal. See 8 U.S.C. § 1229b(d)(l). Other aliens convicted of a crime involving moral turpitude may not qualify for cancellation and adjustment to lawful permanent resident status. See id. § 1229b(b)(l)(C). Additionally, aggravated felons may not seek asylum, see id. § 1158(b)(2)(A)(ii), (b)(2)(B)(i), nor may they seek persecution-based withholding of removal if they have been sentenced to five years or more in prison, see id. § 1231(b)(3)(B).

. The TPCR imposed a more permissive regime that, due to Congress’s concerns about bed space shortages, governed bond determinations for two years after the IIRIRA’s effective date and prior to section 1226(c)’s full implementation. See IIRIRA, § 303(b)(3), 110 Stat. at 3009-586 to -587.

. We agree with the actual holding in Saysa-na v. Gillen, 590 F.3d 7, 18 (1st Cir.2009), that section 1226(c) does not apply to aliens released from custody for their (A) through (D) offenses prior to the IIRIRA's effective date. To the extent that one might glean from Saysana any inferences concerning the issue presented here for the first time, such inferences would not be binding on our en banc court. See United States v. Gonzalez-Arimont, 268 F.3d 8, 13 (1st Cir.2001).

. Our colleagues point out that there is no legislative history suggesting that Congress was more hostile to the discretion of immigration judges in determining whether to grant bonded release to a criminal alien than to the discretion of immigration enforcement in determining whether to bring a criminal alien into immigration custody in the first place. But this is immaterial. Given that we apply Chevron deference, it is incumbent on our colleagues to demonstrate that it clearly lay outside of Congress’s intent to adopt a statutory scheme that would not require immigration enforcement to track down and detain each and every criminal alien, including the low-level narcotics offender, but that would allow immigration enforcement to rest assured that efforts to detain those criminal aliens who do represent enforcement priorities would not go for naught due to the miscalculation of an immigration judge at the alien’s bond hearing.

. Immigration Act of 1990, § 504, Pub.L. No. 101-649, 104 Stat. 4978, 5049; Miscellaneous and Technical Immigration and Naturalization Amendments of 1991, § 306(a)(4), Pub.L. No. 102232, 105 Stat. 1733, 1751 (effective as if included in the 1990 Act).

. Not even the dissent in Rojas cites Matter of Eden.

. Our colleagues suggest that our distinction between exogenous and endogenous characteristics cuts too fine. We will simplify. Section 1226(c)(1), under any reading, both creates a duty and describes a group of people as to whom that duty must be carried out. We see how section 1226(c)(2)’s reference to a person “described in” section 1226(c)(1) could reasonably be understood to refer to a member of the delineated group as to whom the duty exists. But we simply fail to see how a reasonable reader construes the cross-reference as referring to a member of the delineated group as to whom the duty was in fact immediately executed. Section 1226(c)(1), which creates a forward-facing duty, is of course powerless to “describe” the class of people as to whom that duty will in fact be carried out.

. An en banc panel of the Ninth Circuit determined that the constitutional avoidance canon “plays no role in the second Chevron inquiry.” Morales-Izquierdo v. Gonzales, 486 F.3d 484, 493 (9th Cir.2007) (en banc). The Tenth Circuit in Olmos cited that opinion approvingly, Olmos, 780 F.3d at 1323 & n. 2, but also appeared to reject the merits of petitioner’s constitutional avoidance argument in its step two analysis, id. at 1324. As the D.C. Circuit has noted (in a case also cited in Olmos), the Supreme Court has at least once indicated that the “canon of constitutional avoidance trumps Chevron deference.” Nat’l Mining Ass'n v. Kempthorne, 512 F.3d 702, 711 (D.C.Cir.2008) (citing Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council, 485 U.S. 568, 575, 108 S.Ct. 1392, 99 L.Ed.2d 645 (1988)). Since we see no basis for the canon’s application regardless, we decline to take any position on the *60 canon’s precise relevance to the Chevron analysis.

. The Third and Fourth Circuits did not address the constitutional avoidance argument that petitioners press here. See Sylvain, 714 F.3d 150; Hosh, 680 F.3d 375. The Second and Tenth Circuits rejected it, see Lora, 804 F.3d at 613 n. 20; Olmos, 780 F.3d at 1322-24, but the Tenth Circuit noted in a footnote that "[c]onstitutional considerations could become greater when the gap in custody is considerably longer than six days.” Olmos, 780 F.3d at 1324 n. 5.

. Perhaps since he was detained the day after his release, Kim v. Ziglar, 276 F.3d 523, 526 (9th Cir.2002), the petitioner in Demore made no argument about the timing of his release.

. Imagine Aliens A and B in a detention center, each having committed the same section 1226(c) offense, and each similar in all ways, except ICE detained Alien A one day after release from state custody, and Alien B four years after release. Now imagine that each was suddenly released pending completion of his removal hearing. We can see no reason why we can say that, as a matter of constitutional law, Congress could not have reasonably viewed A and B as posing similar flight risks during .the period between release and removal hearing.

. Many statutes and cases in the criminal sentencing area give equal weight to prior criminal convictions irrespective of whether the individual was recently released from custody. A person qualifies, for example, for mandatory life imprisonment as a "violent felon” whether his predicate convictions occurred last year or six years ago. See 18 U.S.C. § 3559(c)(1). Accordingly, we cannot say that Congress could not regard the danger risk as materially reduced merely because the alien has spent some time out of custody.

. Petitioners do not argue that they qualify for the witness protection exception in section 1226(c)(2).